139 N.J. Super. 1 (1976)
351 A.2d 799
PUBLIC SERVICE ELECTRIC & GAS COMPANY, PETITIONER-APPELLANT,
v.
TOWNSHIP OF WOODBRIDGE, IN THE COUNTY OF MIDDLESEX, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 2, 1975.
Decided February 2, 1976.
*4 Before Judges MATTHEWS, LORA and MORGAN.
Mr. Howard T. Rosen argued the cause for appellant (Messrs. Rosen and Weiss, attorneys; Mr. Walter G. Reinhard and Mr. William J. Balcerski on the brief).
Mr. Arthur W. Burgess argued the cause for respondent.
The opinion of the court was delivered by MORGAN, J.A.D.
This appeal raises fundamental questions concerning the propriety of local taxation of structures closely associated with equipment used in the production of electric power at the Sewaren Electric Generating Station of Public Service Electric and Gas Company (Public Service). Consideration must also be given to the formula by which public utility property, found to be locally taxable, is to be valued for such purposes.
For the tax years 1970 and 1971, Block 760, Lots 1A and 9 in Woodbridge were assessed as follows:

 Land Improvements Total
 $959,300 $3,576,350 $4,535,650

The assessment on the land has not been contested and is not an issue on this appeal. Public Service's appeal to the Middlesex County Board of Taxation concerning the assessment as to the improvements on the land was dismissed. De novo appeals were then taken to the Division of Tax Appeals and a plenary trial on all issues was had before *5 Judge LaCorte, who retired before his report could be submitted. The matter was decided, therefore, without his participation, by the full Division on the transcript of the testimony and the briefs.
In its opinion dismissing the appeals the Division of Tax Appeals held locally taxable as real estate all of the structures located on the property. Public Service appeals.
The Sewaren installation is located on a parcel of land containing 87.15 acres located on the Staten Island Sound with access from Cliff Road in the vicinity of Central Avenue. It is bounded on the north by Smith's Creek and the property of Hess Oil and Chemical Co., on the east by the property of the Second Reserve Terminal, Inc., on the west by the property of the Township of Woodbridge, and on the south by the Staten Island Sound. The frontage on the Sound of approximately 2,500 feet is improved (in 1948) with a quay pier 50 feet in depth by 400 feet in length containing a total of 20,000 square feet.
The site is improved with the Sewaren installation which consists of a group of structures erected between 1948 and 1965 which are related in varying degrees to the company's power producing equipment. It is the nature and legal effect of this relationship which is one of the principal concerns of this appeal.
Located on the site are six turbine-generator units and the associated equipment necessary to produce electricity. Units 1-4 have a rated capacity of 454,000 kilowatts; Unit 5, adjacent to Units 1-4, is rated at 344,000 kilowatts. These five units are steam generating units in which water is heated in a boiler to make steam. The steam runs through a turbine which turns the generator to produce electricity. Unit 6 is a gas turbine essentially composed of four pairs of jet engines. Each pair is linked to a turbine and the four turbines to a generator.
Units 1-4 were placed in service during the years 1948-1951; Unit 5 in 1962 and Unit 6 in 1965. All of these units were built on the so-called unit principle whereby one boiler *6 supplies steam to one turbine which powers one generator, as distinguished from older types of stations in which a bank of boilers fed steam to a header which fed a group of turbo-generators. The boiler is specifically designed to meet the needs of the particular turbine it supplies. These needs determine the volume, temperature and pressure of steam. The boiler does not stand on a foundation but is suspended from a huge steel framework, and accessory components of the boiler are similarly mounted.
None of these units or their components were subjected to local taxation; all were clearly recognized as exempt from local taxation under the terms of the Gross Receipts Tax Act, N.J.S.A. 54:30A-49 et seq. The improvements assessed and which are the subject of this appeal include the brick structure which partially surrounds and supports Units 1-5, as well as several lesser structures most of which shelter equipment directly used in power generation.
Apart from the structure associated with Units 1-5 (about which more later) and the waterfront improvements, the other structures assessed as "buildings" consist of the following:
The structure partially enclosing Turbine No. 5  This is a one-story to five-story buliding with precast concrete slab walls, precast concrete plank roof, reinforced concrete floors and steam heat. It consists of a generator room, a turbine room and a boiler house, as well as a stairway and elevator. The only finished interior spaces are in the control rooms which are heated, air conditioned and have adjoining toilet facilities.
Two Screen Houses  These two structures are at waterfront and provide shelter protection for the pumps and screening mechanism used in supplying processing water to the condensors. The first screen house serving Units 1-2 is built of brick over glazed tile with reinforced concrete roof, half steel plate flooring and half reinforced concrete flooring. The screen house serving Units 3-4 is one story, also *7 brick over glazed title, half steel plate and half reinforced concrete flooring.
Structure partially enclosing Turbine No. 6  This is a reinforced concrete structure that is mostly two stories with 32-foot height and part one story that is 13 feet high. This structure was especially built with interior air corridors for air-cooling the equipment and includes special construction designed to reduce the intensity of noise output from the jet engines which power this turbine.
Water Treatment Building  This structure contains equipment used to remove minerals from water obtained from a utility source which is fed into boiler components of the generating equipment and turned into steam. This structure is approximately 12 feet high, 30 feet wide and 50 feet long and has a partial basement which contains a smaller part of the equipment to demineralize city water for use in the boilers.
The coal handling structures here are actually an assemblage of three structures. The first four generating units installed were originally designed to use coal to fire their boilers. Coal was then processed and fed from these structures into the boilers by an overhead gravity feed system. In 1966, because of environmental regulation, use of coal was discontinued and Public Service began to use oil and natural gas as fuel. None of the coal-handling equipment was, however, dismantled. A changeover to coal could be accomplished in a relatively brief period of time, and in fact Sewaren was given permission during the energy crises to use coal, at least on a temporary basis.
The gatehouse  This is a small structure with toilet facilities and is of minimal significance to this controversy.
The administration building  This structure is really the front part of the main structure on the premises, the rear half of which provides partial shelter for turbines 1-4 together with their respective boilers and coal bunkers. It is a structure which most closely resembles a "building" within the normal meaning of that term, although there *8 exists no rear wall separation between it and the power-producing facilities immediately behind it. It has an elaborate lobby, elevator, office space, repair rooms, a cafeteria for the employees and other facilities usual to a commercial type office building.
All of these structures, in addition to the one surrounding Units 1-4 and the waterfront improvements, were subjected to local taxation by Woodbridge Township as "buildings" within the terms of the Gross Receipts Tax Act, and the assessment, together with the formula for valuing these structures for tax purposes, was affirmed by the State Division on appeal. Public Service contends, in substance, that these structures, with the possible exception of the administration building, cannot be regarded as "buildings" within the meaning of the provision of the Gross Receipts Tax Act subjecting "real estate and buildings" to local taxation because these structures constitute an integral part of tax exempt equipment and should be regarded as such for tax purposes as well.
The Gross Receipts Tax Act, N.J.S.A. 54:30A-49 et seq. provides the sole means by which public utilities, such as Public Service, may be taxed. N.J.S.A. 54:30A-51. The declared purpose of the act is
* * * to provide a complete scheme and method for the taxation of street railway, traction, sewerage, water, gas and electric light, heat and power corporations using or occupying the public streets, highways, roads or other public places, to exempt from taxation other than imposed by this act the franchises, stock and certain property of such corporations and for the taxation of the property of such corporations not so exempted from taxation; * * *. [N.J.S.A. 54:30A-49]
The proceeds of the tax collected from each utility are then allocated by the State among the municipalities which accommodate utility property from which the gross receipts tax is derived. The act assigns unit values to each type of public utility property located in the State according to the statutory schedule set forth in N.J.S.A. 54:30A-58, and *9 the taxes collected are apportioned and distributed on the basis of the relative value of the scheduled property in each municipality. N.J.S.A. 54:30A-58 assigns a unit value to "Electric Generating Stations" of $45 per kilowatt of generating capacity. Hence, the revenues derived by a municipality accommodating a public utility bear a direct relationship to the quantity of power produced.
The revenues derived by municipalities sharing in the gross receipts tax on public utilities have been considerable. They reflect the recent inflationary increases in the costs of generation, and therefore the rates for electric power. Hence, they grow even while value of generating equipment which produces the income decreases over the years through depreciation or obsolescence. Woodbridge, for example, has received over $16,600,000 in gross receipts taxes on the Sewaren Generating Station in the five years between 1967 and 1971. Since 1971 its share has been increasing; in 1974 alone Woodbridge derived $4,164,761 in gross receipts taxes from the Sewaren installation.
The act does, however, provide for the local taxation of real estate owned by a public utility. N.J.S.A. 54:30A-52. N.J.S.A. 54:30A-50 defines "real estate" to mean
* * * lands and buildings, but it does not include railways, tracks, ties, lines, wires, cables, poles, pipes, conduits, bridges, viaducts, dams and reservoirs * * * machinery, apparatus and equipment, notwithstanding any attachment thereof to lands or buildings. [Emphasis supplied]
The term "building" was not given a statutory definition.
Hence, property taxable under the State's general tax law, N.J.S.A. 54:4-1 et seq., as improvements to real estate in the nature of common law fixtures, is expressly excepted from local taxation under the Gross Receipts Tax Act. As noted in N.J. Power & Light Co. v. Denville Tp., 80 N.J. Super. 435 (App. Div. 1963):
It seems clear that the legislative intent in defining "real estate" subject to local taxation was to include lands and buildings, as *10 those terms are commonly understood, but to eliminate items of personal property such as machinery, apparatus and equipment which by reason of their attachment to the land or buildings might otherwise be regarded as real property under the common law doctrine of "fixtures." [at 440]
See also, National Lead Co. v. Sayreville, 132 N.J. Super. 30, 37 (App. Div. 1975).
Since the Gross Receipts Tax Act authorizes only municipal taxation of "buildings" (as well as land not in issue here) the central issue to be dealt with is whether the structures assessed at the Sewaren Station are to be regarded as "buildings" within the meaning of N.J.S.A. 54:30A-50, or on the other hand, as Public Service contends, as an integral part of the "machinery, apparatus and equipment" specifically exempted from local taxation.
In order to determine the meaning of the word "building" intended by the Legislature, initial resort should be made to the express terms of the enactment itself. Real estate is not the only property made subject to local taxation. N.J.S.A. 54:30A-52 provides:
All the real estate as herein defined, and the electric and gas appliances to be used for the consumption of gas or electricity and held for resale and not for the purpose of production, transmission or distribution of gas or electric energy, and by-products of gas manufacture held for resale and not for the purpose of production, transmission or distribution of gas or electric energy, owned or held by any taxpayer shall be assessed and taxed at local rates in the manner provided by law for the taxation of similar property owned by other corporations or individuals, and all proceedings for appeal, review and collection available to municipalities and other corporations or individuals with respect to similar property shall be applicable. [Emphasis supplied]
Hence, although the definition of "real estate" found in N.J.S.A. 54:30A-50 excludes therefrom "machinery, apparatus and equipment, notwithstanding any attachment thereof to lands or buildings," some appliances "used for the consumption of gas or electricity * * * and not for the *11 purpose of production, transmission or distribution" thereof are made subject to local taxation. Again, by-products of gas manufacture held for resale "and not for the purpose of production, transmission or distribution of gas or electric energy" are made taxable locally. Such real estate appliances and by-products are taxable in the manner provided by law for "similar property" owned by others.
Distilled from this critical provision is the concept which renders locally taxable that real property not directly used in the production, transmission, or distribution of gas or electric energy. Conversely, real property so used and which therefore generates the gross receipts upon which the State levies the tax shared by the municipalities accommodating such utility, is exempt.
Such conclusion is fortified by reference to N.J.S.A. 54:30A-51.4 which provides:
In order to avoid the double taxation of scheduled property such municipality shall eliminate such property from its tax assessment rolls for the tax year 1962 and thereafter. [Emphasis supplied]
A list of "scheduled property" is set forth in N.J.S.A. 54:30A-58. It includes "Electric Generating Stations" and therefore such stations are not, by the express terms of the act, subject to local taxation, presumably because the revenues derived therefrom are subject to taxation under the Gross Receipts Tax Act. Land, of course, is not uniquely suited and adaptable to power production. The land on which the Sewaren Station is located is equally adaptable to many other non-utility uses. Subjecting it to local taxation will not, therefore, expose the utility to double taxation. Similarly, buildings within the ordinary meaning of that term, offices or other commercial buildings "similar" to those owned by other persons or corporations, are taxed in the manner provided for "similar" property. Buildings or structures adapted and adaptable only to shelter and support electric generating equipment, however, should not, *12 under the plan apparent from these provisions, be locally taxable because they are devoted solely to power production, are part and parcel of the "Electric Generating Station" referred to in N.J.S.A. 54:30A-58 and therefore must be eliminated from the local tax assessment rolls in order to avoid the condemned taxation of both the income derived from the power-producing equipment and the power-producing equipment itself.
As previously noted, the amount of power generated by a utility directly affects the amount of revenue a host municipality derives from the Gross Receipts Tax Act. Hence, the "complete scheme and method" of taxing public utilities outlined in the Gross Receipts Tax Act envisions exemption from local taxation of all equipment directly used in the production of power, since such equipment yields the revenue shared by the municipality on the basis of the amount of power produced. The fact that such equipment may be anchored to the ground by equipment supports resembling a floor and surrounded by brick or masonry walls for purposes of shelter to prevent deterioration and to support associated equipment used in the repair and maintenance thereof should not render such property directly used in power production subject to local taxation. That a given structure consists of masonry or brick and encloses space should not be the determining factor; it is the use of the structure, its relation to power production, its adaptability to uses other than power production, rather than its appearance which determines whether the structure in question can be regarded as a "building" within the meaning of the provision subjecting "building" to local taxation.
N.J. Power & Light Co. v. Denville Tp., 80 N.J. Super. 435 (App. Div. 1963), relied upon by the Division in reaching the conclusion that the structures here involved were locally taxable is not necessarily inconsistent with this view. In Denville the same legal issue was presented  whether structures housing electrical equipment constituted "buildings" *13 subject to local taxation.[1] The court concluded the small concrete block structures there involved were locally taxable. The factual context in which this legal question was resolved concerning the buildings, their contents, or the interrelationship between the two was, however, left unexplored and hence obscure. It cannot therefore be determined whether the buildings in Denville were adaptable to other uses, whether the structures served purposes other than that of sheltering the machinery and the employees who serviced them, or whether the equipment housed there could be removed without affecting the integrity of the structures. Once the essentials of the statutory scheme of public utility taxation is grasped, its application to a given problem is essentially factual in nature. The principles set forth in Denville are sound; their application however to the facts of that case is uncertain because of the lack of factual information provided. Denville, however, does not stand for the proposition that all protective covering to power producing equipment is taxable as buildings. Whether or not such structures are taxable depends upon their nature, their function, their interrelationship with exempt power-producing equipment and ultimately whether they can realistically be viewed as separate from the equipment they surround and support.
The factual nature of the opinion in Denville is more fully disclosed by the manner in which that court distinguished, on a factual basis, the then contemporary opinion in In re Borough of Aliquippa, 405 Pa. 421, 175 A.2d 856 (Sup. Ct. 1961). The court, in Aliquippa held that the foundations and enclosures for the power-producing equipment described in that case were "necessary and integral parts of the manufacturing process," were used "solely for effectuating that purpose" and were excluded from the real estate tax. The *14 court in Denville concluded that the concrete block buildings there in question were unlike the "foundation supports for heavy machinery or the enclosures around coal bins and the like, referred to in In re Borough of Aliquippa, supra."
Aliquippa took an approach particularly applicable to the factual circumstances here present when it said:
* * * [I]n our opinion, a criteria that says nothing is "machinery, tools, appliances and other equipment," but is real estate because the said object requires a massive foundation to prevent vibration caused by its operation and an enclosure to prevent deterioration, is a totally unrealistic view and cannot be imputed to the legislature's intention in enacting the amendments of 1953. As stated by all of the experts for both sides and correctly found by the lower court, the foundations and structures in question are absolutely essential integral parts of each machine, appliance or piece of equipment without which its operation would be rendered impossible. In short, it is all one and the same. Id. at 860.
With the exception of the administration building, the gatehouse and the extensive waterfront improvements to be dealt with below, the considerable testimony adduced at the hearing before the Division demonstrates, to our satisfaction, that all of the structures assessed at Sewaren are inseparable from and integrally related to the power generating equipment with which they are associated and should therefore be considered a part thereof for purposes of local taxation. The photograph of the facility, particularly when viewed from the rear or from above, provide perhaps the most vivid support for the conclusion that these assessed structures cannot be regarded as "buildings" within the legislatively intended meaning of that term. The testimony is to the same effect. The structure partially surrounding the boilers and turbo generators is in part 133 feet high in order to enclose coal hoppers and pulverizers not used between 1966 and 1974 because of environmental regulation.[2] Huge steel girders attached to the walls of this structure are actually part of a 150 ton crane *15 used to remove machinery for repairs. The steel framework from which the boiler is suspended extends right through the rear wall. The boilers can be repaired without affecting the integrity of the structure; their replacement, however, will require that this structure be demolished. The brick structure surrounding this massive equipment cannot, therefore, exist without the equipment it surrounds and must be regarded as an integral part thereof. Once the generators break down completely, this structure will either be abandoned or destroyed. If newer equipment is installed, less sheltering structure will be necessary; recent technological advances have lessened the need for protective covering. For example, Unit 5 installed only ten years after Units 1-4 utilizes less sheltering than the older four units. Expert testimony clearly pointed out, in connection with the question of obsolescence, that over the years less enclosed area was needed to produce a kilowatt of electricity.[3]
*16 The structure's unusually massive reinforced-concrete floor is actually an equipment support. This "floor" is in turn supported by extensive pilings below it, necessitated by the weight of the equipment. The portion of the floor supporting the equipment is separated from other walking areas by an expansion joint to avoid transmitting vibration from the equipment throughout the entire structure. This "floor" also accommodates vertical feed water heaters used to take steam from the turbines. Some of those feed water heaters project above the floor; most of them are below the floor level. Additional equipment at the floor level consists of pumps, compressors, vacuum pumps and essentially all of the auxiliary equipment used to support the main units. Hence, the generating equipment is only partially protected by the assessed structure; only a partial "floor" is provided, and that is actually an equipment support for the massive electric generating equipment. This "floor" also accommodates most of the auxiliary equipment servicing the main generating units. Clearly apart from the administration building and the gatehouse, those structures which house and support the power-producing equipment cannot, in any realistic sense be regarded as buildings within the meaning intended by the Legislature.
The same holds true with respect to the other assessed structures at the Sewaren installation. Although some of these structures do have four walls, a roof and floor in the more traditional sense, they exist only to provide necessary and essential shelter for the equipment they house and are uniquely and solely adaptable to that use. Once the turbine units are abandoned, these structures will serve no function, and will be either abandoned or demolished. More importantly, their existence is justified only as a necessary and integral part of power production at the Sewaren installation.
The only structures that may be considered "buildings" within an acceptable meaning of that term are the administration building attached to Units 1-4 and the relatively insignificant gatehouse. The administration building is an *17 elaborate concrete and steel three-story building finished with brick and trimmed with limestone. It contains a tiled entrance lobby, elevator and the main administrative offices of the plant. The first floor has a large shop area for maintenance and repair of the equipment. On the second floor are located sleeping facilities, locker rooms, showers, a laboratory and a motor room. A cafeteria on the third floor is provided for employee use. Of greater importance, however, is the conceded fact that it is not used directly in the production of power; the space provided therein can be adapted to other uses, and otherwise meets the definition of "building" in the common acceptance of that term. In short, apart from its location at the power generating installation itself, there is little to distinguish it from an ordinary office building. The missing rear wall could easily be replaced. Similarly, the gatehouse structure contains no equipment directly related to power production necessary to render it scheduled property exempt from local taxation as a building.
Nothing in the Gross Receipts Tax Act suggests that the scheduled "Electric Generating Station" required to be removed from municipal tax rolls is restricted only to the power-producing equipment itself apart from the sheltering structures necessary to insure its proper functioning. Equipment and shelter together produce electricity which provide the revenues taxed by the State. The statutory scheme for taxation of public utilities clearly intended that all such power generating equipment, together with all ancillary structures essential and uniquely adaptable to its functioning as such, be not subject to additional taxation by the very municipalities who share in the utilities revenues generated by that equipment. Indeed, the act makes a sharp departure from traditional law in exempting those items which would ordinarily be regarded as fixtures from local taxation. Taxability is to be determined under the act by the role played by the structure in the production of electric power and not by the mere appearance thereof or the fact that simple *18 amenities such as toilets are provided for the employees who work around the equipment. To do so would be to ignore the underlying scheme for taxation of utilities and would, contrary to the express intention of the Act, result in double taxation of such utilities. N.J.S.A. 54:30A-51.4. The assessment on all "buildings" except the administration building and the gatehouse are accordingly vacated.
It remains for us to consider the issues with respect to valuation of the administration building and the gatehouse raised by Public Service. Both experts understandably rejected application of the so-called market data approach in valuing the special purpose structures at the Sewaren station; no comparable sales were available. Rather, the approach taken by both experts and the Division was to start the valuation with a consideration of original or historical cost of the building in question. Woodbridge's expert, however, trended upward this original cost figure to reflect increases in the cost of construction as of the assessing date. The Division agreed with this formula on the theory that N.J.S.A. 54:30A-52 requires utility-owned real estate, subject to local taxation, to be taxed in the manner provided by law for the taxation of all similar property owned by other corporations or individuals. Moreover, the Division declined to accept the rate of depreciation approved by the Public Utilities Commission (P.U.C.) for the Sewaren plant. This rate, 2.352% a year, determined pursuant to N.J.S.A. 48:2-18, is based upon actual life expectancies which undergo continuous engineering review and study. Instead, the Division accepted the lesser rate of depreciation proposed by Woodbridge's expert, of 1.52% a year, resulting, of course, in a substantially higher valuation of the structure in question.
Public Service contends that it is required by the P.U.C. to value its property at its original or historical cost. This figure cannot be increased or trended upwards by the P.U.C. for rate-making purposes even though economic conditions may have changed. A qualified witness for Public Service *19 described the original cost policy of the P.U.C., and several cases have upheld the P.U.C.'s authority to disregard reproduction cost criteria in valuing a utility's property for inclusion in the rate base. State v. N.J. Bell Tel. Co., 30 N.J. 16, 30 (1959); N.J. Bell Tel. Co. v. Bd. Pub. Utility Com'rs, 12 N.J. 568, 585-586 (1953); In re New Jersey Power & Light Co., 9 N.J. 498, 509-510 (1952). These cases evidence the uniform practice of the P.U.C. to value property for rate making purposes at the original or historical cost.
Hence, Public Service urged the Division, and now this court, to adapt this aspect of the P.U.C.'s approach to valuation for rate-making purposes to a municipality's valuation for local purposes. It contends that to do otherwise would be unfair since the permitted return on its investment is calculated with respect to historical cost. In support of this contention Public Service refers to Texas Eastern Trans. Corp. v. Carteret, 116 N.J. Super. 9 (App. Div. 1970) and Transcontinental Gas Pipe Line Corp. v. Bernards Tp., 115 N.J. Super. 593 (App. Div. 1970) both affirmed o.b. 58 N.J. 585 (1971). In both cases certain transmission pipelines owned by federally regulated interstate pipeline companies were assessed by municipal taxing authorities at original cost less depreciation and obsolescence. The municipal assessors used a 15% noncumulative depreciation factor even though both taxpayers were limited by the Federal Power Commission (F.P.C.) to 3% cumulative. The Division of Tax Appeals approved the original cost valuation and found that the F.P.C.'s 3% annual cumulative deduction for depreciation was controlling. In doing so, it rejected the testimony of the expert witness for the municipalities who estimated a 75-year "physical" life span for the pipelines and thereby derived a 1 1/3% annual depreciation deduction. The Division, however, added an "appreciation" factor of 25% to the original cost of the pipelines because of value increases resulting from rising economic costs. The court agreed with the taxpayers in both cases and disallowed the 25% *20 appreciation factor. It also ruled that the rate of depreciation prescribed by the F.P.C. was controlling.
We do not subscribe to the State Division's use of a 25% "appreciation" in the cost, because of rising economic conditions, as was done in the Transcontinental case. These utility companies are limited by federal regulations to a fixed rate of income (6.50%) and that rate is based on "historic cost." So, too, the depreciation is limited by the F.P.C. to 3% of the same historic cost and is not based on any "appreciation" in the cost resulting from rising values. So restricted, it would be inconsistent and unfair to add a 25% appreciation factor in deciding true value for tax assessment purposes. [Texas Eastern Trans. Corp. v. Carteret, supra, 116 N.J. Super. at 17]
We do not, however, regard these cases as controlling decision in the present case. Neither case was decided in a statutory context similar to the present one in which the municipality is specifically required to assess and tax land and buildings of a public utility at local rates "in the manner provided by law for the taxation of similar property owned by other corporations or individuals." N.J.S.A. 54:30A-52. Local rates of taxation applied to valuations derived from distinctly different principles applicable only to property owned by public utility will yield different levels of taxation for public utility property. Such procedures depart from the express statutory mandate and cannot therefore be tolerated. Using the same principles of valuing utility property as are used in valuing the property of other corporations and individuals is not unfair to the utility notwithstanding valuation on other principles for ratemaking purposes. A utility's tax liability, by whatever method derived, will ultimately receive consideration by the P.U.C. in its rate determinations, thus passing on to the utility's consumers the local tax liability imposed. Using a specially derived principle of valuation for local tax purposes would place the impact thereof on the local residents rather than the consumers, a result at variance with the purpose of the statutory requirement that utility property be taxed similarly to all other taxed property in the municipality. We therefore *21 conclude that in these circumstances the Division was correct in applying general principles of valuation, uptrending original cost to reflect the current reproduction cost of the administration building when new.
We do, however, agree with the Public Service that the Division's acceptance of the depreciation factor suggested by respondent's expert lacked evidential support. That expert had suggested a straight-line rate of 1.52% per annum. When asked for the basis of this opinion he replied: "Well, I don't have concrete evidence, but I drove to this courthouse through the City of Elizabeth and it's full of evidence that buildings last 66 years." Woodbridge contends that its expert opinion was based upon his experience in addition to this observation. No doubt that is so. But it is apparent that his opinion as to the appropriate depreciation factor was based on the physical life expectancy of the building rather than its functional life. It is, however, functional life expectancy which controls. Transcontinental Gas Pipe Line Corp. v. Bernards Tp., supra, 115 N.J. Super. at 598-599. Since the rate of depreciation approved by the P.U.C. is based upon actual experience with the utility, the statement by an expert as to his casual observations concerning the physical life span of other kinds of buildings provides an inadequate basis to disregard the P.U.C.'s approach.
The Division's disallowance of any obsolescence factor with respect to the administration building constitutes an exercise of its expertise, is supportable and will not, therefore be disturbed on appeal.
One final matter awaits resolution. Included in the "buildings" valued for purposes of local taxation were the extensive waterfront improvements including bulkheads and wharves. Clearly, such structures cannot be considered buildings under any commonly accepted meaning of that term, and therefore are not subject to local taxation as such. They do, however, form part of the land, are not an integral part of the utility's power production equipment, have utility apart from purposes of power production, and therefore should *22 have been included as part of the land valuation. Bruno v. Long Branch, 21 N.J. 68, 72 (1956). Cf. N.J. Power & Light Co. v. Denville Tp., supra, 80 N.J. Super. at 441-442.
The case is therefore remanded to the State Division of Tax Appeals for determination of the assessment of the administration building and the gatehouse and for separate assessment of the waterfront improvements to be included as part of the land assessment. The assessments with respect to the other improvements are vacated. We do not retain jurisdiction.
NOTES
[1] We note, however, that Denville made no reference to N.J.S.A. 54:30A-51.4, either through inadvertence or, more probably, because the assessments there questioned were for years prior to 1962 and the provision therefore had no application.
[2] Since then they have been used on a temporary basis because of the energy crisis.
[3] Early generating stations were built in the architectural style of the 1920s and were designed to resemble libraries or other public buildings. Gradually, more and more of the apparatus came to be left without a separate protective covering. Originally, only the steel structure from which the boiler is suspended was left uncovered; by the time Unit 5 was built in 1962, the generator was left exposed and for the proposed Units 7 and 8 even the turbines will be left exposed. The same trend is discernible with respect to the two screen houses assessed as taxable real estate improvements. These structures are part of the apparatus which pumps, screens and filters the water from the Sound for use in the generating station. One screen house serves Units 1 and 2; that one contains 2,324 square feet. The other serves Units 3 and 4 and has only 1,176 square feet, or only half of the area enclosed by the screen house serving the earlier units. No screen house exists for Unit 5, built in 1962; the pumps and screens are completely exposed.

Hence, the interdependence between the equipment and the sheltering structure has been demonstrated by the decreased use of protective covering resulting from technological evolution, and supports Public Service's position that the surrounding structure is an integral part of the equipment it supports and surrounds and did not function primarily as shelter for the employees servicing this equipment.