RIMM, J.T.C.
The novel issue before the court in this matter is the taxability for local property tax purposes of certain structures at an *247 electric nuclear generating station owned and operated by a public utility. The subject property is the Oyster Creek Nuclear Generating Station (the station) situate on the west side of U.S. Route 9 on premises designated as Block 1001, Lot 4 on the official tax map of Lacey Township.[1]
For the tax year 1981 the original assessment was:
Land $ 4,935,000
Improvements 33,937,900
Total $38,872,900.
The matter is in the Tax Court by direct appeal pursuant to N.J.S.A. 54:4-21. The two issues originally before the court were set forth in the pretrial order as valuation and the “propriety of assessing certain property for local property tax purposes as opposed to excluding them for such purposes in accordance with N.J.S.A. 54:30A-49 et seq.” N.J.S.A. 54:30A-49 et seq., the Gross Receipts Tax Act (the act), imposes excise and franchise taxes payable to the State and measured by the gross receipts of certain types of public utilities and provides for the apportionment of the net proceeds of the taxes among the municipalities in which or in whose streets scheduled utility property of a utility is situated. The act provides the sole means by which public utilities, such as plaintiff herein, may be taxed. N.J.S.A. 54:30A-51. The purpose of the act is
... to provide a complete scheme and method for the taxation of street railway, traction, sewerage, water, gas and electric light, heat and power corporations using or occupying the public streets, highways, roads or other public places, to exempt from taxation other than imposed by this act the franchises, stock and certain property of such corporations and for the taxation of the property of such corporations not so exempted from taxation [N.J.S.A. 54:30A-49J
Scheduled property is specifically defined in N.J.S.A. 54:30A-50(d) and 54:30A-58 and the act assigns values to each type of public utility property according to the statutory schedule set forth in N.J.S.A. 54:30A-58. The act provides, however, that “[a]ll the real estate as herein defined ... owned or held by any *248 taxpayer shall be assessed and taxed at local rates in the manner provided by law for the taxation of similar property owned by other corporations or individuals____” N.J.S.A. 54:30A-52. As used in the act,
“Real estate” means lands and buildings, but it does not include railways, tracks, ties, lines, wires, cables, poles, pipes, conduits, bridges, viaducts, dams and reservoirs (except that the lands upon which dams and reservoirs are situated are real estate), machinery, apparatus and equipment, notwithstanding any attachment thereof to lands or buildings. [N.J.S.A. 54:30A-50(b) ]
Plaintiff, Jersey Central Power & Light Company, is a public utility as defined in N.J.S.A. 48:2-13, engaged in the generation, transmission, distribution and sale of electricity to the public and is subject to the regulatory jurisdiction and control of the New Jersey Board of Public Utilities pursuant to the authority of the Public Utilities Act, as amended, N.J.S.A. 48:2-1 et seq.
In addition to other lands and facilities it owns, maintains and operates in Lacey Township, plaintiff owns the station which is operated pursuant to an operating agreement by GPU Nuclear Corporation, an affiliate, and which is rated at 650 megawatts. The heat which creates the steam necessary to drive the turbines and generate electricity at the station is produced by a controlled nuclear reaction, and the station is subject to the continuing jurisdiction and control of the Federal Government pursuant to the Atomic Energy Act of 1954, 68 Stat. 919 (codified as amended at 42 U.S.C.A. § 2201 et seq.) and Title II of the Energy Reorganization Act of 1974, 88 Stat. 1233 (42 U.S.C.A. § 5801 et seq.) and is licensed by the Nuclear Regulatory Commission (NCR). The construction of the station was, and its continuing operation is, specifically governed, among other regulations, by Title 10, Energy, Code of Federal Regulations, Chapter I—Nuclear Regulatory Commission, Part 20— Standards for Protection Against Radiation (10 C.F.R. § 20.1 et seq.), Part 50—Domestic Licensing of Production and Utilization Facilities (10 C.F.R. § 50.1 et seq.), and Part 100—Reactor Site Criteria (10 C.F.R. § 100.1 et seq.). The output of the station provides a substantial portion of plaintiff’s overall electricity generating requirements needed to supply electric utility *249 service to more than 700,000 customers throughout its service territory which covers about 43% of the area of New Jersey.
Prior to the commencement of the trial the parties settled the valuation issue and partially settled the taxability issue. It was agreed that the correct assessment for the land for the tax year 1981 was $2,502,000. It was also agreed that, of the 20 structures on the subject property on the basis of which the improvements assessment was made, 16 structures would be assessed at $9,500,000 for local property tax assessment purposes. The parties also stipulated to the amounts of the assessments for the four other structures if they are assessable for local property tax purposes. The four structures and their agreed assessments, if assessable, are:
Structure Assessment
Reactor structure $ 6,450,000
Radwaste I or old radwaste structure 790,000
Radwaste II or new radwaste structure 5,030,000
Emergency generator structure 230,000
Total $12,500,000
The parties, however, differ sharply on the propriety of imposing assessments for local property tax purposes on these four structures, and the issue of their taxability is before the court.
The plaintiff contends that all four structures are so involved with the generation of electricity that they are equipment exempt from local property taxes in accordance with the act. The taxing authority contends that all four structures are buildings and are taxable as real estate in accordance with N.J.S.A. 54:4-1, et seq., dealing with persons and property subject to taxation and providing generally for the taxation of real estate by local municipalities.
The reactor structure houses the nuclear reactor which produces steam for the generation of electricity. The reactor itself consists of the apparatus which causes nuclear fission and the vessel in which the apparatus is contained.
*250 The vessel is part of a primary containment system and is constructed of carbon steel seven inches thick. It is designed to withstand an internal pressure of 1,250 pounds per square inch and encloses a process which creates approximately 1,000 pounds of pressure per square inch under normal functioning conditions. It’s purpose is to contain the nuclear reaction, the heat produced, radioactive waste material and radiation and to withstand destruction in the event of a nuclear accident.
The fuel used in the process of nuclear fission is referred to as enriched uranium and during the course of the nuclear fission reaction “a tremendous amount of energy is released.” Along with the energy, two new atoms are created which are almost always radioactive. The nuclear reaction takes place inside fuel pellets within the reactor and generates heat. The heat is then transferred to water causing the water to boil and converting the water to steam which first goes through a high pressure turbine and then is distributed to three low pressure turbines. The process gives the name “boiling water reactor” to the reactor at the station. The steam, or thermal dynamic energy, going through the turbines is converted to mechanical energy. The mechanical energy of the turbines is converted to electrical energy in the generator and the electricity goes into the electrical distribution system. The steam is exhausted from the low pressure turbines into condensers through which water from Barnegat Bay is circulated. The steam is condensed to water by being thus cooled, the water is then pumped back into the reactor and the process is repeated.
Other components of the primary containment system include an inverted light bulb-shaped three-quarter inch thick steel object known as a dry well in which is contained the reactor. The dry well is a pressure vessel designed to withstand pressure surges of up to 65 pounds per square inch in the event of a rupture of a pipe inside the reactor vessel which would release water and steam into the dry well. An absorption pool, or the torus, a donut-shaped steel cylinder, surrounds the base of the dry well. Its purpose is to absorb heat if there is an accident which releases steam or water into the containment area. The *251 entire primary containment system extends from 19 feet six inches below sea level to 119 feet six inches above sea level. Thus this unit is of considerable mass.
The radiation resulting from the nuclear fission process which occurs at the station is known as ionizing radiation. The primary forms of radiation found at the station are referred to as alpha, beta, gamma and neutron radiation. The radiation is produced in several ways. Primarily, it is produced from the fission process during the explosion of the fuel atom in the core of the reactor. Secondly, radiation is also produced in the fission fragments, that is, the particles that remain after the fuel has undergone fission. Thirdly, radiation or radioactive material is produced by a process called activation when the material used in the process passes through the core of the reactor. In this station, water is passed through the core to cool the apparatus. The hydrogen in the water is changed into deuterium which is a radioactive isotope of hydrogen. In addition, there are impurities in the water, such as metallic particles from the walls of the piping, which when passed through the core become radioactive.
The radiation has extensive biological effects usually broken down into two broad categories. One is somatic, referring to effects that occur in the person actually struck by the radiation. The other category is genetic, referring to the effects that may not appear in the individual that is struck by the radiation but may appear in future generations. Somatic is in turn broken down into two sub-categories, one being acute and one being chronic. Acute effects include, obviously, death and other effects such as nausea, vomiting, and loss of hair. Chronic effects are those which may occur at a later time and include cancer.
Various measures are employed to protect against these harmful effects of radiation. The measures essentially refer to time, distance and shielding. The less time one is exposed to radiation, the less likely there will be harmful effects. The further away one gets from a source of radiation, the less the *252 likelihood is of adverse effects because radiation disperses as it travels. Shielding involves the placing of materials that will absorb radiation between the radiation’s source and the environment. The material will then absorb the radiation instead of having the radiation absorbed in the environment or in human bodies. Typically at a plant generating electrical power the shielding is by the use of water, steel, lead or concrete or a combination of these materials. For example, a two-inch thickness of lead will reduce the amount of radiation by a factor of ten, which is to say that the radiation on the side away from the radiation source will only be one-tenth of what it was on the other side. Water and concrete are usually used to shield against neutron and gamma radiation respectively at the station. High density concrete is used with a 12-inch thickness of concrete reducing the neutron radiation by a factor of ten and the dry well is shielded by such concrete varying in thickness from four feet to approximately eight feet at the thickest part.
The reactor structure itself is rectangular in shape, has no windows and consists of a first level 19 feet six inches below sea level.[2] The next level in the structure is at ground level which is 23 feet six inches above sea level. There are also floor levels in the structure at 51 feet three inches; 75 feet three inches; 95 feet three inches and 119 feet three inches and the roof is just above elevation, 162 feet above sea level or 138 feet six inches above the ground. There is also a part of a floor elevation at 38 feet where certain pumps are located and which elevation is reached from the 51 feet three inch elevation by entering a room and going down steps to the lower elevation. From the fifth floor level to the roof, the structure is constructed of steel siding. The rest of the structure, walls and floors, is constructed of concrete varying in thickness from one and one-half feet to three feet. In addition to housing the nuclear reactor itself, the structure houses the reactor control systems *253 and various types of equipment located on each floor in the structure outside the primary containment system, such as storage tanks, condensers, filters, pumps, heat exchangers, drain tanks, control rod drive hydraulic units and the containment spray system, an emergency system to cool the reactor in case of accident. Also located in the structure are other emergency systems used to protect the reactor, and hence the public, in the event of a failure of the normal cooling systems. The emergency systems presuppose that the reactor is shut down and that the plant is “essentially off the line from an electrical generating point of view.”
Below the minus 19 feet six inch floor level there is a reinforced concrete foundation approximately ten feet thick so that the reactor structure from the base of its foundation to its roof is in excess of 191 feet six inches. The reactor structure also contains rooms or vaults with doors, floors, ceilings and walls which enclose some of the equipment in the structure. These rooms are made of reinforced concrete except that at least one room has a section of its wall made of solid concrete block which can be removed so that equipment can be taken in and out. The structure also contains an elevator and a railroad airlock by means of which equipment is brought into the structure. The airlock consists of two double doors which may be opened only one at a time. Personnel access to the structure is gained in a similar fashion through an airlock system with two doors which also may be opened only one door at a time. There is also a double airlock door system to the roof. The structure is heated to approximately 50 degrees in the winter so that the pipes in the structure do not freeze. There is no air conditioning.
Personnel work in the structure, and various tasks relating to the reactor are performed by such personnel in the reactor structure including certain types of testing and surveillance required by the NRC. For example, there is a “tour” at least once a shift by which an “operator” tours each floor of the structure to make sure that nothing is wrong. In addition, certain equipment has to be tested once a month. When the *254 plant is shut down extensive preventive maintenance and repairs are performed in the reactor structure.
The refueling procedures are performed at elevation 119 feet three inches, or the top floor of the structure, which is above the top of the reactor vessel, and the equipment involved in the fuel transfer, removal of old fuel and refueling is located here. These procedures include removing the top of the reactor vessel and involve the use of a crane that rides on railroad tracks to accomplish the procedures. Such procedures are not done in connection with the everyday functioning of the fission process in the reactor. Also located on the top floor is the fuel storage pool constructed of steel and concrete and filled with water.
The structure also serves to contain any radioactive material which may escapé from the reactor. This material is caught, filtered and cleaned, and is vented out of the structure through a smokestack by means of equipment installed in the structure. This special ventilation system associated with the reactor structure is called a stand-by gas treatment system. It insures that the air exhausted from the structure is properly treated and filtered so that most of the harmful radioactive material is removed. For this purpose, the structure is under negative pressure, that is, the air pressure inside the structure is maintained at approximately one tenth of one pound per square inch less than the outside atmospheric pressure. Maintaining the environment within the reactor structure at below atmospheric pressure in this way assures that if there are leaks in the structure, air will flow into and not out of the structure. The structure contains radiation during normal operation when radiation is released from the reactor. In the event of an accident, the structure would contain radiation and radioactive material to insure that such radiation and material is not released into the environment. For these reasons, the structure has been designated a secondary containment system.
The old radwaste structure, or Radwaste I, was originally a water reprocessing plant in which radioactive material was removed from the water from the plant in the form of sludge or *255 solids, and then the relatively clean water would be recycled to be used again in the reactor. The structure continues to be associated with the fuel storage pool cooling system. Water from the fuel storage pool is circulated through a portion of old radwaste, designated the fuel pool demineralizer, where it is filtered and returned through coolers to the fuel storage pool. Radwaste I is now being utilized essentially for two purposes: one is to store liquid radioactive waste in the tanks of the building and the second is to store solid radioactive waste such as sludge or resins, and rags, gloves and similar contaminated debris from the cleaning of the plant or the doing of maintenance in and around the station. These contaminated materials are stored for later shipment to radioactive waste dumps. There is a truck bay at the structure into which trucks can be driven to be loaded with radioactive materials to be removed and disposed of at radioactive burial sites. The structure also contains tanks, filters, demineralizers, and radwaste concentrators which concentrate the solid particles and clean liquid for reuse. The structure itself is not as “tight” a structure as the reactor building although it is also under negative air pressure and has a filtering system. It is built with reinforced concrete and its walls vary in thickness from one and one-half feet to approximately three and one-half feet, and it contains doorways. The roof is also of reinforced concrete and is at least one-foot in thickness.
In approximately 1978, Radwaste II, or the new liquid-solid building was constructed and put into service. The new building was constructed because the original structure was too small to handle the amount of radioactive material that was being generated in the plant. Secondly, it was discovered that the materials used in the piping of Radwaste I were being adversely affected by the extreme ranges of chemicals in the water, as well as radioactivity, and that these chemicals caused extensive corrosion. Accordingly, it was decided to discontinue the use of Radwaste I for its original purpose and to construct a new system for removing radioactive waste from the water used in the plant.
*256 Radwaste II is used as the recycling center for radioactive water that is generated in the plant. In this structure the water is processed, filtered, demineralized and the highly radioactive sludge is solidified by being mixed with concrete and turned into a solid block. Solid waste is then loaded on trucks and shipped out of the station from this building. This structure has three elevations with floors and ceilings. It has exterior walls of uniform three-foot thickness of reinforced concrete except for one section of the top floor which has steel siding. This structure is also under negative air pressure although there are no airlocks at points of ingress and egress. There is a “garage door” that does seal, although there is no prescribed time limit as to how long it may remain open.
The emergency diesel generator vault is a rectangular structure which houses a diesel oil storage tank and two diesel generators. The part of the structure which contains the generators is 39 feet six inches wide, 75 feet six inches long and approximately 14 feet high. A “cubicle” attached to the westerly side of the structure, 16 feet by nineteen feet nine inches and the same height as the structure, actually houses the storage tank. The structure is constructed of reinforced concrete walls one and one-half feet thick, without windows, and is actually divided into two vaults, separated by a one and one-half foot thick concrete wall. Each vault contains one of the generators. There are two entrance ways into each vault with doors of wire mesh construction. The roof consists of concrete slabs laid across the top of the walls with openings covered with gratings to allow air into and exhaust out of the area housing the generators. Employees enter the structure when it is necessary for them to work on the generators. Routine maintenance of the generators is required by the plant’s operating license to be performed at least once every eighteen months or as otherwise needed. The generators are periodically dismantled for maintenance, and this procedure takes place within the generator vaults. Visual inspections of the generators are made three or more times daily. The vault also contains an “output breaker,” which is a ten-foot square cubicle. This is *257 essentially a breaker panel and is designed to control the generation of electricity by the emergency generators. The vault is equipped with lighting fixtures attached to the ceiling.
Plaintiff claims that the four structures described “are simply not ‘buildings’ under the ordinary and common meaning of that word” as defined in Public Service Elec. & Gas. Co. v. Woodbridge City, 73 N.J. 474, 479, 375 A.2d 1165 (1977) and are therefore not assessable for local property tax purposes. In that case the Supreme Court held that certain structures, essentially of concrete or brick construction, were buildings and hence taxable as real estate for local property tax purposes. The Appellate Division in Public Service Elec. & Gas. Co. v. Woodbridge City, 139 N.J.Super. 1, 351 A.2d 799 (App.Div.1976) had held that the structures were not taxable buildings because they are “adapted and adaptable only to shelter and support generating equipment,” are “Electric Generating Stations,” or scheduled property under N.J.S.A. 54:30A-58 and are part of the “machinery, apparatus and equipment” exempt from local property taxation under the act. Id. at 11-12, 351 A.2d 799. The Supreme Court reversed, quoting the definition of “huilding” from N.J. Power & Light Co. v. Denville Tp., 80 N.J.Super. 435, 194 A.2d 16 (App.Div.1963):
A “building” in the usual and ordinary acceptation of the word is a structure designed and suitable for habitation or sheltering human beings and animals, sheltering or storing property, or for use and occupation for trade or manufacture. [73 N.J. at 479, 375 A.2d 1165]
The Supreme Court held that there was
nothing in the language, purpose or history of the statute to indicate that the Legislature sought in this enactment to differentiate between buildings directly involved in the generation of light and power and buildings indirectly or not at all so involved. Presumptively, all utility buildings at the site of, and used in connection with, the operation of a power generating or transmission plant contribute, directly or indirectly, to the production, generation or transmission of power. Nevertheless, they are all unqualifiedly rendered subject to local taxation by the statute. [Ibid.; emphasis supplied]
In spite of the Supreme Court’s holding, plaintiff argues that the reactor structure and the two radwaste structures are not for the habitation or sheltering of human beings or animals or for sheltering or storing property. On the contrary, plaintiff *258 claims the structures are enclosures to prevent the release of radiation. Therefore, according to plaintiff, since their purpose is the retaining of radiation the purpose is exactly the opposite of the commonly and ordinarily understood purpose and function of a building, which is to keep out the environment. The purpose of these structures is to retain what is inside, that is, radiation and radioactive material, and thus they are not buildings. They are, plaintiff claims, “part of the machinery, apparatus or equipment which serves to make the nuclear fission process safe, and therefore, possible.” Plaintiffs argument is that the structures do not accomplish the purposes set forth in the definition of “building” in the Supreme Court's opinion in Woodbridge. Plaintiff contends that the three structures are secondary containment, the purpose of which is to protect the environment and the public from the extremely deleterious and toxic nature of the radioactive materials used and the radiation resulting from the nuclear fission which occurs in the reactor vessel. Plaintiff points particularly to the nature of radiation, its serious adverse effects and the necessity for protecting the environment and the public. The structures are, hence, so inextricably part of the electricity generating process that they are part of scheduled property under the act and exempt from local property taxation. In effect, plaintiff says that the secondary containment function is so integrally a part of the electricity generating function that the three structures cannot be taxed for local property tax purposes.
Plaintiff’s position that the function of the structures as secondary containment makes them exempt from local property taxation is clearly untenable. Such a position is essentially in accordance with what the Appellate Division said in its Wood-bridge opinion:
the considerable testimony adduced at the hearing before the Division demonstrates, to our satisfaction, that all of the structures assessed at Sewaren are inseparable from and integrally related to the power generating equipment with which they are associated and should therefore be considered a part thereof for purposes of local taxation. [139 N.J.Super. at 14, 351 A.2d 799.]
However, this conclusion of the Appellate Division was specifically rejected by the Supreme Court which said:
*259 According to the proofs, the structures are also work-places for personnel. There are control rooms which are heated and air-conditioned and contain toilets as well as separate areas for instrument repair work. Maintenance work goes on in all the buildings. Compare N.J. Power & Light Co. v. Denville Tp., supra, 80 N.J.Super. at 439, 194 A.2d 16. [73 N.J. at 478, 375 A.2d 1165]
The rationale of Denville which the Supreme Court approved and adopted in its Woodbridge decision was that the Legislature in defining “real estate” subject to local taxation in accordance with the act intended to include buildings as that word is commonly understood. In Denville, the Appellate Division concluded that the Legislature did not intend to exempt buildings of “any and all dimensions” from local property taxation merely because they house machinery, equipment and apparatus. In Woodbridge the Supreme Court said that the legislative intent was to subject buildings to local property assessment regardless of the extent of their “ ‘integration’ ... with equipment by attachment, affixation or functional use.” 73 N.J. at 479, 375 A.2d 1165; emphasis supplied. As a result of this determination, although one of the purposes of the three structures is to protect the environment from extremely deleterious and toxic radiation and the radioactive materials used at the station, the structures are still buildings and not scheduled property for local property tax purposes. Additionally, a secondary containment system is so different from a primary containment system that the former cannot be considered so inextricably a part of the electrical generating system as to be scheduled property and not a building under the act. As explained by the municipality’s witness[3], if the reactor structure were exposed to the same pressure which the primary containment system is constructed to withstand, “pieces of it would be all over Lacey Township.” Beyond that, the struc *260 tures house equipment, controls and other personal property other than the actual reactor, and the structures are places in which personnel work to accomplish various tasks assigned to them in connection with the generation of electricity. Each of these three structures, the reactor structure and Radwaste I and II, is equipped with overhead flourescent lighting typical of a workplace. The structures do in fact protect the reactor and the electrical generating system from the elements and shelter persons and property from the environment. The fact that the structures also serve another purpose, that of protecting the environment from by-products of nuclear fission, does not render them any less buildings by any definition in common understanding or the law of this State.[4]
Plaintiff does not. contend that the emergency generator vault is secondary containment and hence part of scheduled property for that reason. Plaintiff does however contend that the generators are for emergency use in connection with the nuclear fission process. Essentially, the generators are needed to generate electricity when the plant “trips” off line, in order to maintain the systems of the plant and to keep it safely shut down. Plaintiff claims that the generators and the structure housing them are so inherently involved with the generation of electricity that they are part of scheduled property and exempt from local taxation. There is no dispute between the parties that the generators are part of scheduled property. However, the structure housing the generators is a building in the ordinary and accepted definition of a building set forth in Wood-bridge. In fact, evidence before the court was clearly to the effect that the considerable mass of the generator structure *261 was dictated by federal regulations to protect the generators from the elements and from accidents which occur outside the generator structure. See 10 C.F.R. 50, Appendix A.[5] The thickness of the exterior walls is particularly important for the protection of the equipment inside the vaults from external objects being thrown against the structure.
Plaintiff also argues that the generator structure is akin to a wall or fence with open steel gratings and concrete slabs above the walls and is not a building for that reason also, relying on the determination in Denville that the cyclone fences on the utility’s property were not buildings. 80 N.J.Super, at 441, 194 A.2d 16. While a fence is not a building, the generator structure in the present case is not a fence. It is, as already indicated, a building in the ordinary and generally accepted definition of that word prescribed by the Supreme Court in Woodbridge. It houses equipment and protects it from the elements and is also a place where persons work in connection with the operation of the equipment.
Plaintiff also contends that since the construction of the station and its operation was and is under federal control, the structures in question, constructed and operated in accordance with rigid federal requirements, are therefore also not to be taxed as buildings. The contention is essentially that, since the structures are built and operated in accordance with the regulations for constructing and operating equipment as well, the structures are equipment. The Atomic Energy Act of 1954 took what had previously been the military application of nuclear energy and allowed commercial enterprises to have access to it. It provided for adoption of regulations by the Atomic Energy Commission. The legislation was amended in 1974 with the establishment of the Nuclear Regulatory Commission. The regulations adopted in accordance with the legislation, Title 10, Code of Federal Regulations, establish the requirements which *262 must be met before the Nuclear Regulatory Commission will issue a license for a power plant to operate. The regulations establish the general design criteria (GDC) and the safety precautions which must be incorporated in a nuclear plant before it will be permitted to operate. There are a total of 64 of these criteria in Appendix A of Part 50 dealing with containment and fuel storage and handling and radioactivity control. The GDC also establish requirements for containment, that is, for structures to enclose the radioactive material generated through the fission process to insure that the public is not exposed to such material. The GDC also refer to fuel handling operations. The criteria also establish other requirements for containing any accidental releases of radioactive material during fuel handling. Each application for a construction permit must include a preliminary safety analysis report which sets forth a preliminary design for the nuclear facility in accordance with the GDC. See 10 C.F.R. § 50.34 (1981). The regulations also establish how to determine an exclusion area around a plant as required by 10 C.F.R. § 34(a)(3) to insure that persons will not be exposed to excessive radiation from normal or accident conditions. 10 C.F.R. § 100.11 (1962). In addition, Part 20 refers specifically to protection for radiation workers and the general public during normal operation of a nuclear plant. The radiation workers include those personnel who work within the reactor structure, the radwaste structures and other structures at the station, such as the turbine building. Part 100 deals with the amount of radiation that is permitted to be released during an accident. 10 C.F.R. § 100.11 (1962).
Although the structures are thus built to rigidly prescribed federal regulations, they are not scheduled property under New Jersey law. There is obviously nothing in the federal regulations which prescribes the manner in which the structures are to be taxed at the local or state level. The rigid federal requirements for construction and operation of a nuclear generating station do not change New Jersey law on taxation.
It is important to note that the GDC also provide for the construction of structures to protect equipment and apparatus *263 against natural phenomena. Structures, systems and components important to safety are designed and built to withstand the effects of natural phenomena such as earthquakes, tornadoes, hurricanes, floods, tsunamis and seiches without loss of capability to perform their safety functions. These requirements place the structures squarely within the definition of buildings in the Supreme Court’s decision in Woodbridge. The fact that three of the structures also serve another purpose does not derogate from their use as buildings under New Jersey law for public utility taxation.
The Clerk of the Tax Court will enter judgment that the assessment for the tax year 1981 for Block 1001, Lot 4 is as follows:
Land $2,502,000
Improvements 22,000,OOP[6]
Total $24,502,000.

 The local property tax assessment for Block 1001, Lot 4-1, also the subject of taxpayer’s complaint, was settled prior to the commencement of trial and is not now before the court.

 A11 elevations in the reactor buildings were given with reference to mean sea level in both the oral testimony presented and the various plans of the structure marked in evidence.

 Interestingly enough, the one witness presented by plaintiff and the one witness presented by the municipality had been in the United States Navy nuclear power program. The testimony of both witnesses was clear in dealing with a highly technical and complex problem. In addition to their clarity, both witnesses evidenced great candor, but nowhere in the testimony of plaintiff's witness can it realistically and reasonably be discerned that the subject structures arc not buildings for local property tax purposes.

 The primary containment system is so inextricably part of the process that there is no dispute between the parties that it constitutes a part of the scheduled property under the act. In spite of its mass and the manner by which it is attached to the freehold, it is not a building. To this extent, the test determining taxability of property for public utility purposes is distinguishable from the test determining taxability of property for business personal property purposes. Cf. City of Bayonne v. Port Jersey Corp., 79 N.J. 367, 399 A.2d 649 (1979).

 See General Design Criteria 2 and 17. The federal regulations which set forth the general design criteria are discussed infra, at 262.

 The improvements assessment consists of the agreed assessment of $9,500,-000 for the 16 structures about which there is no dispute plus the stipulated assessable value of $12,500,000 for the four structures which were in dispute and which have been determined to be assessable as real estate for local property tax purposes.