■ In the Matter of TENNECO, INC.-TENNESSEE GAS PIPELINE DIVISION, Appellant, v TOWN OF CAZENOVIA et al., Respondents. — Appeal from an order of the Supreme Court at Trial Term (Kepner, Jr., J.), entered April 26, 1983 in Madison County, which dismissed petitioner's application, in a proceeding pursuant to article 7 of the Real Property Tax Law, to review petitioner's real property tax assessment for the 1981-1982 tax year.

Petitioner, Tenneco, Inc.-Tennessee Gas Pipeline Division (Tenneco), transmits natural gas through 13,546 miles of pipeline running from the Gulf of Mexico into New England. A 4.62-mile portion thereof lies underground in a 50-foot wide easement in the Town of Cazenovia, Madison County. This segment traverses private land. Thus, the real property involved was valued locally rather than centrally by the State Board of Equalization and Assessment, as in the case of special franchises (Real Property Tax Law, art 6). The property was assessed for the 1981-1982 tax year by the town at $715,800 for the

improvements since the landowners were assessed for the value of the land. Petitioner protested the assessment. The Board of Assessment Review of the Town of Cazenovia upheld the assessment. Petitioner then timely commenced this proceeding pursuant to article 7 of the Real Property Tax Law.

At trial, each side produced an appraisal and the testimony of expert witnesses on value. Petitioner's appraisal expert was Robert H. McSwain; respondents' appraisal expert was John F. Havemeyer, III. They arrived at different value figures through application of different methods of valuation. By written decision, the trial court concluded that the pipeline was a specialty, warranting use of the local reproduction cost new less depreciation (RCNLD) method to determine value. The court accepted Havemeyer's physical depreciation calculation of $180,000 and rejected McSwain's theory of economic obsolescence. Accepting Havemeyer's appraisal of $1,620,000 for the improvements, the trial court confirmed the valuation of $715,800 placed upon the property by respondents (see *Matter of Shubert Organization v Tax Comm.*, 60 NY2d 93, 97). This appeal by petitioner followed.

The first issue presented is whether the trial court properly adopted the RCNLD approach to determine value. We conclude that it did.

Initially, it should be noted that the instant proceeding involves a real property tax assessment as opposed to a special franchise tax assessment. A valuation for special franchise tax purposes encompasses valuation of the tangible real property as well as of an intangible component, the franchise to use the property in the public way (Real Property Tax Law, § 102, subd 17). The RCNLD method is the accepted method to determine the value of a specialty (*Matter of Onondaga County Water Dist. v Board of Assessors*, 39 NY2d 601, 605). In this case, the trial court properly found petitioner's pipeline property to be a specialty. The subject property meets the requirements for such treatment set forth by the Court of Appeals in *Matter of County of Suffolk (C. J. Van Bourgondien, Inc.)* (47 NY2d 507, 512). The pipeline is unique and specially built for the purpose of transporting natural gas and is used for that purpose. There is no market for the type of property and there are no sales of property for such use. It could not be converted without substantial expenditures and it is an appropriate improvement, which if destroyed, would be reasonably expected to be replaced or reproduced (cf. *Matter of Brooklyn Union Gas Co. v State Bd.*, 101 AD2d 414).

Petitioner's reliance upon cases applying the net earnings rule to value special franchises for the proposition that income

capitalization based on earnings is an appropriate method is misplaced. The leading case of *People ex rel. Jamaica Water Supply Co. v State Bd.* (196 NY 39) illustrates that the net earnings method, which capitalizes the net earnings of the taxpayer, is used to value the intangible franchise for special franchise tax purposes. There the value of the tangible real property was determined on a cost basis.

The second issue presented for our review is whether the trial court properly accepted Havemeyer's application of the RCNLD method with respect to determining physical depreciation and economic obsolescence. We conclude that the trial court erroneously accepted Havemeyer's physical depreciation calculation of $180,000 and, since a proper calculation cannot be made from the existing record, a reversal and remittal for further proceedings to determine the proper amount of depreciation to be used in appraising the pipeline segment is required.

The parties stipulated the reproduction cost new of the pipeline in the town to be $1,800,000. However, the experts disagreed substantially on the amount of depreciation to be allowed. Depreciation includes physical depreciation, functional obsolescence and economic obsolescence (*Matter of Putnam Theat. Corp. v Gingold,* 16 AD2d 413, 417). Neither expert made an allowance for functional obsolescence. Therefore, we are concerned with physical depreciation and economic obsolescence.

Physical depreciation is described as "wear and tear occasioned by use and the elements" (*id.*). There was testimony from respondents' expert, a chemical engineer specializing in metallurgy, that the 30-year-old pipeline segment, which was cathodically protected, had an indefinite useful life and had experienced less than 10% physical deterioration. Havemeyer used this percentage and reached a value of $1,620,000 for the subject property. It was improper, however, to use the concept of an indefinite useful life. The matter should be remitted for the purpose of determining the allowance for physical depreciation by dividing the value of the tangible property by the number of years of its estimated physical life (see *People ex rel. Manhattan Ry. Co. v Woodbury,* 203 NY 231, 236).

Economic obsolescence is defined as "loss of value brought about by conditions that environ a structure, such as a declining location or the downgrading of a neighborhood resulting in reduced business volume" (*Matter of Putnam Theat. Corp. v Gingold, supra,* p 417). McSwain made an allocation of 76.32%, or $274,752, for economic obsolescence. He calculated this percentage by adjusting the reproduction cost of the entire system to a level which, considering his projected level of net utility

operating income of $127,000,000, would result in a market rate of return of 13%. He attributed the resulting 76.32% reduction to economic obsolescence. It appears then that McSwain's concept of economic obsolescence is nothing more than an attempt to convert the RCNLD approach into an income capitalization approach. This is not permissible. The income approach determines the taxpayer's business interest in the property, not necessarily the value of the property. While an allowance for economic obsolescence may be made when the property is not worth the reproduction cost, depending upon the earning capacity after reproduction (*People ex rel. Delaware, Lackawanna & Western R. R. Co. v Clapp,* 152 NY 490, 494), it cannot be made in these circumstances where petitioner is profitable and the property would be reproduced.

That petitioner is a regulated utility does not alter this conclusion. Petitioner argues that since its income is based in part on the original cost of the pipeline less depreciation, the pipeline cannot have a fair market value derived by using a reproduction cost which is more than three times the original cost. Petitioner's income, while regulated, is not fixed; if for some reason, petitioner were required to replace the pipeline at today's costs, its rate base would increase and its rates would be allowed to increase to generate the necessary income to provide the approved rate of return. Thus, the value of the pipeline should not be limited by petitioner's current income.

Order reversed, on the law, without costs, and matter remitted to Special Term for further proceedings to determine the proper amount of depreciation to be used in appraising the subject property. Mahoney, P. J., Casey, Weiss and Mikoll, JJ., concur.

Kane, J., dissents in part and concurs in part in the following memorandum. Kane, J. (dissenting in part and concurring in part). Assessments in the Town of Cazenovia are measured on the basis of 100% of value. Both parties stipulate that the reproduction cost for the 4.62 miles of pipeline in question would be $1,800,000. The record demonstrates that its original cost in 1951 was $380,000 and that there have been no added capital costs in the Town of Cazenovia. The question to be resolved in this proceeding is to determine the fair market value of petitioner's real property as of May 1, 1981.

The definition of market value, accepted by the American Institute of Real Estate Appraisers and Society of Real Estate Appraisers, is "[t]he most probable price in terms of money which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller,

each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus". In no case shall an assessment exceed that value (NY Const, art XVI, § 2; *Matter of Hellerstein v Assessor of Town of Islip,* 37 NY2d 1).

The within controversy is, essentially, a disagreement as to the method of determining that value when a petitioner's earning ability is subject to the jurisdiction and control of the Federal Energy Regulatory Commission (FERC). A complicated appraisal problem is presented. This is best evidenced by the fact that petitioner's expert was of the opinion that the market value of the property was $95,100, while the town's expert arrived at a value of $1,620,000. The assessors have assessed the property at $715,800, following closely an advisory valuation by the State Board of Equalization and Assessment.

It is my view that the appraisal method adopted by petitioner is the proper one and that the trial court erred in not accepting the methodology applied by petitioner's expert. First, the use of the unit rule should not have been rejected. In determining value, the entire operating system must be evaluated in order to arrive at a valid appraisal for any portion of the whole. The 4.62 miles of line in the Town of Cazenovia, unconnected to the rest of the system, would have little, if any, value of its own. Second, it was improper to accept a valuation based upon reproduction cost less depreciation without factoring in an amount for economic obsolescence. The traditional rules and methods of appraisal can reach a just result when applied to a regulated industry only when the economic facts of life are approached realistically. Earnings are limited to a predetermined percentage of original cost less depreciation or "rate base". When the same earnings are returned on a base determined by a reproduction cost over three and one-half times the original cost, the earning rate is obviously drastically reduced. A potential purchaser would require a rate of return at least equivalent to that received on the original cost "rate base". Accordingly, the reproduction cost less depreciation figure would have to be adjusted to obtain an acceptable market rate or return; otherwise, the potential purchaser would not invest. The requisite adjustment is economic obsolescence and the amount thereof must be determined to obtain fair market value. Fair market value cannot be determined by applying a depreciation rate computed on the basis of "physical depreciation" alone. The record demonstrates the validity of this conclusion. Uncontradicted expert proof established that this 4.62 miles of cathodically protected pipeline, installed in 1951, had experienced a physical deterioration of a mere 10%, resulting in a fair market value of $1,620,000 in the opinion of

the town's appraiser. If this valuation were applied proportionately to the 13,500 miles of pipeline in petitioner's system, the enormity of error becomes obvious.

Furthermore, I fail to perceive how a remittal can solve the error, for there is nothing in the record that can produce a different conclusion if depreciation is determined by dividing the value of the tangible property by the number of years of its estimated physical life. A different rate would be a purely subjective determination based upon sheer speculation. The simple fact is that economic obsolescence must be considered to arrive at a realistic rate of depreciation in order to determine fair market value. Earnings are an integral part of that determination, and the limits imposed upon them by FERC cannot be overlooked in arriving at a just result. It is certainly a more enlightened approach and is representative of current thinking in many of our sister States (see *Montaup Elec. Co. v Board of Assessors*, 390 Mass 847). Such a process, in turn, entails consideration of market data to arrive at a capitalization rate which will act as a guide to determine the rate of return a prospective investor would require.

The specific amount of economic obsolescence is obtained by determining the income deficiency, considering petitioner's projected net utility operating income, after application of that capitalization rate, which when reduced to a percentage figure can be applied to the reproduction cost less depreciation of the 4.62 miles of pipeline in the Town of Cazenovia. This economic obsolescence factor is the result of the FERC regulatory policies which limit earnings to a rate of return on original cost less depreciation and not on reproduction cost less depreciation. Thus, when the amount of economic obsolescence is subtracted from the reproduction cost less depreciation, the result is the indicated fair market value (see *Matter of Great Atlantic & Pacific Tea Co. v Kiernan*, 42 NY2d 236, 242). The ultimate objective is fair market value, and if a cost approach and an income approach are both used to corroborate each other, the result is a closer determination of fair market value. We have recently held that either method may be used in establishing value for special franchise tax purposes, stating that courts should not establish an exclusive rule to apply in all cases (see *Matter of Brooklyn Union Gas Co. v State Bd.*, 101 AD2d 414). Such a rule should apply with equal force in evaluating the real property of a utility (*Onondaga County Water Auth. v New York Water Serv. Corp.*, 285, App Div 655, 662).

Accordingly, I would accept the methodology used by petitioner's appraiser and his concept of valuation based upon the

reproduction cost less depreciation, which, of course, for the reasons stated, must include an amount of economic obsolescence due to loss of value because of governmental regulation. To do otherwise will only shift the ultimate burden of paying local taxes, in large measure, to the consumers of natural gas throughout the area served by petitioner's system, a result which is neither desirable nor acceptable.

However, while accepting the methodology and determination of petitioner's appraiser, I would add to it the sum of $65,000, representing the value to petitioner of the 50-foot right of way for 4.62 miles it obtained to install the pipeline. While the right of way itself was not included in the assessment levied upon the pipeline (Real Property Tax Law, § 102, subd 12), and the land was assessed to the fee owners and not petitioner, the original cost or the replacement cost of the right of way to petitioner must be considered in any determination of fair market value (see *People ex rel. Topping v Purdy,* 143 App Div 389, affd 202 NY 550).

Therefore, I would reverse Special Term's order, accept petitioner's appraisal and add thereto a value for the right of way in the sum of $65,000. This would result in a fair market value of $160,100 for real property tax purposes at 100% of value.