TRANSCONTINENTAL GAS PIPE LINE CORPORATION, PLAINTIFF–APPELLANT, v. BERNARDS TOWNSHIP, DEFENDANT–RESPONDENT, ALGONQUIN GAS TRANSMISSION COMPANY, PLAINTIFF–APPELLANT, v. BERNARDS TOWNSHIP, DEFENDANT–RESPONDENT.

Argued March 14, 1988—Decided August 15, 1988.

508

512

*Angelo A. Mastrangelo* argued the cause for appellant Transcontinental Gas Pipe Line Corporation (*Fox, Schackner & Mastrangelo*, attorneys; *Mr. Mastrangelo* and *Stephanie E. Malcolm*, on the brief).

*Robert F. Danziger* argued the cause for appellant, Algonquin Gas Transmission Company (*Large, Scammell & Danziger*, attorneys).

*Louis P. Rago*, argued the cause for respondent.

The opinion of the Court was delivered by

HANDLER, J.

This case presents the complex issue of determining the proper method for valuing the property of a regulated industry for purposes of local property taxation.

We are asked to review the municipal tax assessments of segments of pipeline that are used by the taxpayers for the interstate transmission of natural gas, an operation that that is subject to comprehensive federal regulation. We determine that the method of valuation proposed by the taxpayers, which is based essentially on the book value of the property that is

used and approved for ratemaking purposes, does not reflect the proper worth or fair market value of their pipelines for property tax purposes, and that such property should be valued according to its depreciated replacement cost. Further, because the methodology used by the municipal assessor to determine value for tax assessment purposes was so patently deficient and the resultant assessment amount so unreliable, the assessment cannot be affirmed. Accordingly, we remand the matter to the Tax Court for an independent determination of the value of the property for tax purposes.

## I.

Transcontinental Gas Pipe Line Corporation (Transco) and Algonquin Gas Transmission Company (Algonquin) both operate interstate natural gas pipelines that run through Bernards Township. Prior to the 1983 property tax assessment, the pipelines had been valued according to an interim or provisional method established in *Transcontinental Gas Pipeline v. Township of Bernards*, 115 *N.J. Super.* 593 (App.Div.1970) (*Transcontinental I*), aff'd o.b. 58 *N.J.* 585 (1971), and *Texas Eastern Trans. Corp. v. Borough of Carteret*, 116 *N.J. Super.* 9 (App. Div.1970), aff'd o.b. 58 *N.J.* 585 (1971). Under this method, interstate natural gas pipelines were valued at their original cost less depreciation, without any recognition of any increase in value over time, up to an upper limit of 48% depreciation. Following this methodology, the Transco pipeline's assessed value, including its fifty-foot easement, was $675,000, resulting in a property tax of $32,718.60. The Algonquin pipeline was valued at $569,700, resulting in a property tax of $28,371.06.

For the 1983 tax year, as part of an overall reassessment of the Township's property, Bernards Township abandoned the *Transcontinental I* methodology and assessed the property at its replacement cost less depreciation. As of the October 1, 1982, assessment date, Transco's pipeline was valued at $1,959,-200, resulting in a tax of $34,677.84 and Algonquin's pipeline

was valued at $1,678,900, resulting in a tax of $30,068.76. The similarity between the 1982 and 1983 tax figures for the two pipelines is not coincidental; in his deposition, the assessor who performed the original assessment candidly admitted that while he did consult some external sources to determine replacement cost, his primary consideration was to establish a value that would yield substantially the same tax dollars at the Township's new tax rate as had been yielded in the previous year under the old tax rate. Since other property in the Township had been assessed, on average, at approximately three times its 1982 value due to the 1983 revaluation, the assessor essentially tripled the pipelines' 1982 assessment and worked backwards to determine replacement cost and depreciation figures.

The pipeline companies challenged these assessments in the Tax Court, alleging that the assessment methodology was incorrect. In addition, they challenged the 48% cap on depreciation established by the *Transcontinental I* court's interim methodology, arguing that, as a regulated utility their income was limited by the value of property that is included in their rate base by the Federal Energy Regulatory Commission (FERC). Since the FERC-mandated depreciation of their property had long ago exceeded 48%, the pipeline companies argued that it was unfair to value their property for *ad valorem* property tax purposes at a value higher than the FERC-determined value at which it earned income as part of the utility's rate base. The two cases were tried together by the Tax Court, with evidence of each proceeding applying to both cases.

At trial, the pipeline companies used the unit-valuation method, determining the value of each pipeline company as a whole, then allocating a percentage of this overall figure to the company's assets within the Township. The rationale for this approach is that a pipeline must operate as an entire unit to produce earnings, and an isolated section of pipeline would have little or no value standing alone. The pipeline company experts presented evidence of comparable sales as well as income and cost figures based on the income, rate of return, and cost

figures utilized in FERC ratemaking proceedings. The resulting values were all very close to the book value of the property: Transco's expert testified to a valuation of $216,000, in contrast to a depreciated original cost of $213,376, and Algonquin's expert computed a value of $252,318, compared to a depreciated original cost of $208,392.

The Township, on the other hand, presented evidence that the original assessment, if anything, was too low. In light of the useful lifetime of the property, which the taxpayers' own experts testified was indefinite if properly maintained, and the Township's expert estimated to be at least 100 years, the Township argued that the 45% lump sum depreciation used in the original assessment was too high, and that a 1% annual straight line depreciation for each pipeline would be more appropriate. The Township expert thus opined that the proper replacement cost new less depreciation of the Transco property was $3,428,923, and the proper value of the Algonquin pipeline was $3,440,000. The Township's expert also testified that he found no reason to reduce the value of the property to reflect functional or economic obsolescence.

The Tax Court upheld the original assessment, rejecting both pipeline companies' proposed market sales and capitalized income valuations, and in addition rejecting Algonquin's proffered stock and debt valuation as well as its depreciated replacement cost method, which in essence equated FERC depreciation with economic obsolescence. In *Transcontinental Gas Pipeline Corp. v. Bernards Township, (Transcontinental II)*, 7 *N.J. Tax* 508 (Tax Ct.1985), aff'd 9 *N.J. Tax* 636 (App.Div. 1987) (*per curiam*), the Tax Court rejected Transco's [1] contention that the pipeline should be valued for property tax purposes in the same manner as it is valued in FERC ratemaking proceedings, and concluded that replacement cost new less

---

[1] Algonquin's challenge to its assessment was rejected in a separate, though substantially similar, unpublished opinion.

depreciation is the proper method of valuing such special purpose property. The Appellate Division consolidated the Transco and Algonquin appeals, and the majority below affirmed the Tax Court decisions in each case. The dissent, however, argued that the Tax Court approach failed to consider the impact of this manner of property taxation on the pipeline as a whole. The case thus comes to us as an appeal as of right pursuant to *Rule* 2:2–1(a)(2).

## II.

Taxpayers, in challenging the municipality's original assessment, bear the burden of rebutting the validity of the *quantum* of this assessment. *Riverview Gardens v. Borough of North Arlington*, 9 *N.J.* 167, 175 (1952). As we observed in *Pantasote Co. v. City of Passaic*, 100 *N.J.* 408 (1985), this presumption is not simply an evidentiary mechanism allocating the burden of proof, but "a construct that expresses the view that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law." *Id.* at 413. In *Aetna Life Ins. Co. v. City of Newark*, 10 *N.J.* 99 (1952), the Court announced what has come to be accepted as the definitive verbal formulation of the burden imposed on a taxpayer challenging an *ad valorem* property tax assessment: "it is not sufficient for the taxpayer merely to introduce evidence: the presumption stands until sufficient competent evidence is adduced to provide a true valuation different from the assessment. Such evidence must be definite, positive, and certain in quality and quantity to overcome the presumption." *Id.* at 105. In *Pantasote* we interpreted this to mean that the presumption remained in place even if the municipality utilized a flawed valuation methodology, so long as the *quantum* of the assessment is not so far removed from the true value of the property or the method of assessment itself is so patently defective as to justify removal of the presumption of validity. *Pantasote, supra*, 100 *N.J.* at 415.

In attempting to meet this burden, taxpayers presented evidence of market value,[2] income capitalization, original cost less depreciation, and replacement cost less depreciation including a significant reduction based on FERC regulation as a form of economic obsolescence. We agree with the Appellate Division that the Tax Court was correct in ruling that taxpayers failed to overcome the presumption of correctness that attaches to the municipality's assessment.

The Tax Court correctly rejected taxpayers' market valuation on the grounds that the pipelines are speciality property so uniquely adapted to its current purpose of transporting natural gas that no ready market for such property exists. *See, e.g. Hackensack Water Co. v. Borough of Old Tappan*, 77 *N.J.* 208, 223 n. 1 (1978) (Handler, J., dissenting), *Tenneco, Inc. v. Town of Cazenovia*, 104 *A.D.*2d 511, 512–13, 479 *N.Y.S.*2d 587, 589 (1984) (defining special purpose property), appeal after remand, 134 *A.D.*2d 772, 522 *N.Y.S.*2d 250 (1987). Taxpayers' own experts conceded that no market exists for the isolated sections of pipe standing alone, and that sales of entire pipeline systems were sufficiently separate in time, place, and characteristics of the property in question as to make the comparative sales approach virtually meaningless. It has long been the rule in this State that for special purpose property the test of its selling price on the open market is an inappropriate measure of value, and expert testimony with respect to this value is not probative of value. *Royal Mfg. Co. v. Bd. of Equal. of Taxes*, 76 *N.J.L.* 402 (Sup.Ct.1908), aff'd 78 *N.J.L.* 337 (E. & A.1909), *see also Dworman v. Borough of Tinton Falls*, 1 *N.J.Tax* 445 (Tax Ct.1980), aff'd, 180 *N.J.Super.* 336, 3 *N.J.Tax* 1 (App.Div.), certif. denied, 88 *N.J.* 495 (1981) (noting that the cost approach is utilized to value special purpose property). For this reason, both our

---

[2]Algonquin also offered evidence relating to a stock and debt approach, but its own expert gave this approach little weight due to the fact that Algonquin stock is not publicly traded. Neither the Tax Court nor the Appellate Division gave any credence to this evidence of value.

courts, *see Texas Eastern, supra,* 116 *N.J.Super.* at 16, *Transcontinental I, supra,* 115 *N.J.Super.* at 597, and the courts of other states, *see, e.g., Tenneco, supra,* 104 *A.D.*2d at 512–13, 479 *N.Y.S.*2d at 589, have rejected the market approach to valuing interstate natural gas pipelines for the purposes of *ad valorem* property taxation.

■ Taxpayers, however, argue that this market information is relevant in a secondary sense, since the evidence presented shows that most pipelines sell at or near book value, which is essentially the figure reached by their capitalization of income and cost valuation approaches. Although some courts have found this corroborating evidence relevant to the valuation of utility property, *see Montaup Electric Co. v. Board of Assessors of Whitman,* 390 *Mass.* 847, 852–53, 460 *N.E.*2d 583, 587 (1984) (rejecting any valuation figure significantly above book value (depreciated original cost) in the absence of evidence that a willing buyer would pay more than that amount for the property), we are not persuaded by this approach. It would be contradictory to reject the market approach on the grounds that it is an unreliable and inappropriate measure of an asset's worth, due to the fact that the asset was constructed for a particular purpose by the owner without any consideration of resale, *see CPC International, Inc. v. Borough of Englewood Cliffs,* 193 *N.J.Super.* 261, 269–70 (App.Div.1984), but then give credence to the result of such an approach as support for the correctness of another valuation approach.

■ In addition, it does not appear that such transactions reflect all of the interests in the property of a regulated utility. Almost all such sales are from one natural gas pipeline company to another, and are subject to the approval of FERC, which prevents the new purchaser from including in the purchasing utility's rate base any value for the pipeline in excess of the purchased pipeline's book value. The reason for this is that the cost of an asset owned by a utility is eventually charged to the ratepayers as a cost through depreciation, and to allow a

purchaser to increase its rate base to reflect the purchase price would force the ratepayers to pay twice for the same asset.[3] *See, e.g., Texas Eastern Transmission Corp. v. Sealy Ind. Sch. Dist.,* 580 *S.W.*2d 596, 601 (Tex.Civ.App.1979). Due to the fact that FERC allows such property to be depreciated over a time period considerably shorter than its functional life, however, this totally depreciated property in fact has a significant value to the consumers that would not be reflected in the purchase price paid by an investor for the undepreciated assets of the utility. For these reasons, we find that taxpayers' evidence of comparable sales had no probative weight either as direct evidence of value or corroborative evidence of the validity of the results of other valuation methods.

The Tax Court was also justified in not relying on taxpayers' attempt to establish the value of their property through the capitalization of income approach. Under this assessment methodology, the value of a property purchased for investment purposes is equated with the present value of the projected net income stream that will be earned by the property over its useful life. American Institute of Real Estate Appraisers, *The Appraisal of Real Estate,* 71, 315 (7th ed. 1978). To use this valuation approach it is necessary to obtain a reliable determination of the property's earning potential, as well as an appropriate capitalization rate that reflects the return investors would require on similar investments. In the absence of such information, the capitalization of income approach must be rejected, and another valuation methodology utilized. *See, e.g., Pantasote, supra,* 100 *N.J.* at 412 (rejecting income approach for special purpose property).

---

[3] In cases where the acquired property will not be used to provide service to its original customers, however, no question of double payment is presented, and FERC will allow the full acquisition cost to be included in the rate base. *See, e.g., Black Hills Power & Light Co.,* 40 *F.P.C.* 166 (1968); *Virginia Electric Power & Light Co.,* 38 *F.P.C.* 487, 488 (1967).

The income approach is problematic in this case. Unlike an apartment building or a shopping mall, the properties at issue here are sections of pipeline in Bernards Township that produce no income in and of themselves. They have value only as links in the interstate systems that transport and sell gas to local utility companies. To circumvent this problem, both taxpayers urge this Court to adopt the unit valuation method, which values the entire pipeline system as an operating business and then allocates or attributes a portion of the total net income to the particular property in question. In this case, taxpayers suggested as an allocation factor the ratio of the book value of the pipelines in Bernards Township to the total book value of all of the assets in the utility's rate base.

We reject this method of valuation, which has been urged, in some form, by the dissent below. Although the approach is attractive in its simplicity, its application as a method of property tax valuation is inappropriate for several reasons. On a theoretical level, for example, it defeats the purpose of the income approach of property taxation, which attempts to capitalize the income of the real property separate from the value of the business using the property, *see, e.g., Transcontinental II, supra,* 7 *N.J.Tax* at 521. Furthermore, it is contrary to the approach taken by the Tax Court with respect to other locally valued utility property, *see, e.g., Hackensack Water Co. v. Haworth,* 178 *N.J.Super.* 251, 261, 2 *N.J.Tax* 303, 313 (App.Div.), certif. denied, 87 *N.J.* 378 (1981) (court rejected a valuation process that sought to recognize the cost of improvements located outside the taxing district in the assessment of the utility's reservoir).

More importantly, however, there appear to be insurmountable practical problems with the unit valuation approach. In particular, the taxpayers' methodology for allocating a percentage of this income to a particular asset of the utility is problematic. Taxpayers performed this allocation by comparing the book value of the utility's rate base property as a whole to the

book value of the property in question. This allocation factor, however, is based on several questionable assumptions. First, in determining the percentage of the total value of the utility property represented by the property in Bernards Township, the allocation factor proposed by taxpayers assumes that book value is an accurate measure of even the comparative worth of the various components of the utility's property. However, due to the fact that such property is added to the rate base over a span of decades, the book value of the utility as a whole will include property with greatly disparate costs of construction. As long as construction costs increase over time, book value will tend to overvalue newer property in relation to older property. To the extent that FERC allows depreciation of utility property over a period of time much shorter than its useful life, this undervaluation of older property is magnified. Thus, within a regulatory scheme similar to FERC's, substantially similar assets can have dramatically different book values. *See, e.g., Public Service Co. v. New Hampton,* 101 *N.H.* 142, 152–53, 136 *A.*2d 591, 599 (1957) (illustrating this anomaly of depreciated original cost valuation). While this inequity may not matter to an investor valuing the entire unit, it provides no assurance of the accuracy of the allocation to any particular asset.

Even if an accurate allocation percentage could be derived, the method still assumes that a utility's property earns income directly proportionate to its rate base value. This is a disputable assumption, since a utility's rate base includes not only pipelines, pump stations, and storage tanks, but office buildings, automobiles, as well as other assets, such as construction work in progress, that currently do not contribute to providing service to consumers. While it can be said in a macroeconomic sense that all of these assets contribute directly or indirectly to the transportation of natural gas, *see Public Serv. Elec. & Gas Co. v. Township of Woodbridge,* 73 *N.J.* 474, 479 (1977), it is unreal to believe that diverse assets all contribute to a utility's income earning potential in a manner exactly proportional to

their comparative depreciated original costs. *See Boston Edison Co. v. Board of Assessors of Watertown,* 387 *Mass.* 298, 299–301, 439 *N.E.*2d 763, 765 (1982), appeal after remand, 393 *Mass.* 511, 471 *N.E.*2d 1312 (1984) (rejected income valuation approach to electric utility's property because "[i]t was not feasible to allocate a portion of Edison's overall revenue and expenses to Edison's Watertown property.") As the New York Court of Appeals recently observed in rejecting the unit valuation approach as a method of determining the property tax value of an interstate natural gas pipeline:

> While this system is a complex system with each part necessarily relying upon other parts, the uniform allocation of earning power based upon original cost is risky, at best. Some parts of the system may very well throw off earnings at a greater percentage of cost than a corresponding and physically equal part. [*Brooklyn Union Gas Co. v. State Board of Equal. and Assessment,* 65 *N.Y.*2d 472, 485, 492 *N.Y.S.*2d 598, 602, 482 *N.E.*2d 77, 81 (1985) (quoting lower court opinion), *cert.* denied, 475 *U.S.* 1082, 106 *S.Ct.* 1461, 89 *L.Ed.*2d 718 (1986).]

Taxpayers claim that the unit valuation method is in fact a correct allocation method, since they are only allowed to earn on their rate base, and their assets yield the same rate of return to investors no matter what the particular character of a certain asset may be. While this is a correct characterization of a utility's property from the perspective of an investor, it glosses over a subtle but pivotal aspect of utility ratemaking. A utility does not in fact earn income on its rate base in the same manner as an investor earns income on capital invested in the rate base; it earns income by using its assets to sell gas at a rate set by FERC at a level which, if FERC has properly anticipated demand and cost of service, will allow it to cover its costs and provide a reasonable return on invested capital. H. Averch & L. Johnson, "Behavior of the Firm Under Regulatory Constraint," 52 *Amer.Econ.Rev.* 1052 (1962). It is simply incorrect to assume that utility property uniformly generates income in direct proportion to its book value. *See New Hampton, supra,* 101 *N.H.* at 148–49, 136 *A.*2d at 597. We agree with the highest courts of New York and Massachusetts that the unit valuation method is an unreliable means of determining the

ideal or true income of utility property. Since without a proper or reliable determination of income it is impossible to apply the income approach, we find that the Tax Court was correct in rejecting taxpayers' income valuation figures.

It should be noted that even if a proper income could be determined, the difficulties attendant on the determination of income would also taint the derivation of an appropriate capitalization rate. Both taxpayers developed a capitalization rate by, in effect, re-creating the process by which its rate of return was determined for FERC ratemaking purposes. This approach has elements of self-fulfilling prophesy, since FERC determines estimated net income by multiplying the book value of the property by a rate of return, and then setting gas rates at a level that should produce this income, and taxpayers propose determining the value of the property by dividing the resulting net income by what is essentially the same rate of return.

The circularity of this valuation approach was recognized by the United States Supreme Court more than fifty years ago in *Missouri Ex Rel. Southwestern Bell Telephone Co. v. Public Service Commission*, 262 *U.S.* 276, 292, 43 *S.Ct.* 544, 548, 67 *L.Ed.* 981, 987 (1923) (Brandeis, J., concurring), and was noted by this Court in *Helmsley v. Borough of Fort Lee*, 78 *N.J.* 200, 214 (1978) ("Once income is controlled, however, using capitalization of income to determine value to regulate future income is a circular process."), appeal dismissed, 440 *U.S.* 978, 99 *S.Ct.* 1782, 60 *L.Ed.*2d 237 (1979). The problems caused by this circularity are aggravated by the fact that the FERC rate of return and book value figures have no external assurance of accuracy. In *Federal Power Commission v. Hope Natural Gas Co.*, 320 *U.S.* 591, 64 *S.Ct.* 281, 88 *L.Ed.* 333 (1944), an interstate natural gas pipeline company challenged the then newly-adopted practice of the Federal Power Commission (FERC's predecessor) of valuing utility property for ratemaking purposes at depreciated original cost rather than the prior practice of basing such determination on depreciated

replacement cost. The pipeline company's arguments that depreciated replacement cost was the only proper measure of fair value was rejected by the Court, which ruled that the investors' interest in their property was protected by the Commission's statutory obligation to provide them with a reasonable return on their investment. So long as the return provided was sufficient to assure confidence and financial integrity of the enterprise, and to maintain its credit and ability to attract capital, the Court ruled, the particular manner in which this result was reached was not important:

It is not the theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important.

[*Hope Natural Gas Co.*, *supra*, 320 *U.S.* at 602, 64 *S.Ct.* at 288, 88 *L.Ed.* at 345.]

In other words, value for FERC regulatory purposes does not necessarily have to have any relation to the value of such property for other purposes so long as the rate of return or cost of service factors are adjusted to generate sufficient revenues to provide investors with a reasonable return on capital invested. *See Permian Basin Area Rate Cases*, 390 *U.S.* 747, 791–92, 88 *S.Ct.* 1344, 1372–73, 20 *L.Ed.* 2d 312 (1968) (judicial review of FERC price determination limited to determining whether rate selected is within a zone of reasonableness.).

Therefore, a FERC utility's book value and rate of return are not only circular with respect to the utility's income figures, but are mutually dependent upon each other.[4] While this system is

---

[4]In fact, since it is only the total effect of the ratemaking proceeding that is at issue, errors in determining both the value of the property and the rate of return could be offset by overestimation of the cost of service component included in the rate charged to consumers for gas, which in the end determines the actual income earned by the utility. In this context, it should be noted that the share of gross income attributable to cost of service, which for Transco exceeded $3,400,000,000, dwarfs that allocated to provide a return to investors, which for Transco was approximately $130,000,000. The central issue in this

internally consistent with itself and thus produces no real
hardship to the investors and consumers whose interests it is
designed to protect, the validity of applying these figures
outside the context of FERC ratemaking proceedings is ques-
tionable. For example, the validity of using the FERC rate of
return as a capitalization rate depends on the reliability with
which the FERC determination of depreciated original cost
accurately reflects the true value of the property. If it is a
reliable measure of true value, the capitalization rate derived
from it will be correct and will yield a reliable value through the
income approach (assuming the correct portion of the utility's
net income is allocated to the local property in question). If the
FERC value figures are not accurate reflections of true value,
however, the income approach calculations will be derivatively
skewed. Depreciated original cost, as will be shown, *see infra*
at 526–529, is not a reliable indicator of true value for property
tax purposes, and therefore the Tax Court properly disregarded
the taxpayers' income valuation figures.

In addressing the plausibility of depreciated original cost as a
measure of true value we can recapitulate the three basic
approaches to property valuation. These are the market ap-
proach, which assumes that a property is worth what purchas-
ers are willing to pay for similar property, the income approach,
which assumes a property is worth the present value of its
projected net income stream, and the cost approach, which
assumes that a property is worth what a prudent person would
pay to replace it. As demonstrated, the market and income
approaches are of little probative worth with respect to these
regulated specialized properties. This is not an uncommon
situation in property taxation; courts of this state have long
recognized that for certain types of unique property that were
constructed for a special purpose and are only suited for that
particular purpose, the market and income approaches are not

case, the value of the pipeline, is thus a relatively minor aspect of the overall
regulatory determination.

applicable. *See, e.g., Hackensack Water Co., supra,* 77 *N.J.* at 215; *id.* at 223 (Handler, J., dissenting); *CPC International, supra,* 193 *N.J.Super.* at 269 (discussing other cases); *Transcontinental I, supra,* 115 *N.J.Super.* at 597 (noting with respect to the same property at issue in this appeal that neither the market or income approaches were feasible methods of valuation). With regard to such special purpose property, the cost approach is usually relied upon for property tax valuation purposes. *See, e.g., Pantasote, supra,* 100 *N.J.* at 412; *Dworman, supra,* 1 *N.J.Tax* at 452.

Property used by utilities to provide service to ratepayers is perhaps the prototypical example of special purpose property. As the New York Court of Appeals observed with respect to a natural gas pipeline:

> The pipeline is unique and specially built for the purpose of transporting natural gas and is used for that purpose. There is no market for the type of property and there are no sales of property for such use. It could not be converted without substantial expenditures and it is an appropriate improvement, which if destroyed, would be reasonably expected to be replaced or reproduced. [*Brooklyn Union Gas Co., supra,* 65 *N.Y.*2d at 487, 492 *N.Y.S.*2d at 604, 482 *N.E.*2d at 83).]

Courts of this state have applied the cost approach to value natural gas pipelines, *Transcontinental I, supra,* 115 *N.J.Super.* at 597, electrical utility property subject to local taxation, *Public Service Elec. & Gas Co. v. Township of Woodbridge,* 139 *N.J.Super.* 1, 18 (App.Div.1976), rev'd on other grounds, 73 *N.J.* 474 (1977); *see also Boston Edison Co., supra,* 387 *Mass.* at 299–301, 439 *N.E.*2d at 765 (valuing electric utility property), and water utility property, *Hackensack Water Co., supra,* 77 *N.J.* at 215; *Haworth, supra,* 178 *N.J.Super.* at 261, 2 *N.J.Tax* at 313.

The central question to this appeal, however, is whether original cost or replacement cost is the proper measure of the worth of utility property for the purposes of local property taxation. Transco, in its cost estimate, presented evidence of only depreciated original cost, and Algonquin, while presenting some evidence of replacement cost, utilized an unrealistic value

for economic obsolescence that essentially transformed replacement cost into original cost.[5] Although some courts have indicated otherwise, *see, e.g., Boston Edison Co., supra,* 387 *Mass.* at 306–07, 439 *N.E.*2d at 769; *Texas Eastern Trans. Corp., supra,* 580 *S.W.*2d at 605, we find that the depreciated original cost has no independent relevance in the determination of value for property tax purposes even when this figure is used by a regulatory agency for ratemaking purposes.

In our opinion, reliance on the depreciated original cost undermines and is inconsistent with the fundamental assumption on which the cost approach is based. The cost approach takes as its upper limit of value what a prudent person would pay *on the assessment date* to construct property of equal desirability and utility, and then incorporates reductions in value for depreciation, functional obsolescence, and economic obsolescence to reflect the actual age, condition, and utility of the property in its present state. *See The Appraisal of Real Estate, supra,* at 67, 264. The proper economic worth of such property is what the market would pay to replace it, not what the owner paid for it at the time of its initial construction. While original cost may represent the true value of an asset at the time of its construction, the assumption that the original cost of utility property is evidential of its current fair market value is one that self-destructs with the passage of time. *Hackensack Water Co., supra,* 77 *N.J.* at 224 (Handler, J., dissenting) (citing Eiteman, "Approaches to Utility Evaluation For Ad Valorem Taxation," *Pub.Uil.Fort.,* May 23, 1963, at 19,

---

[5]Algonquin's cost approach involved trending the original cost of the rate base, deducting FERC depreciation, and then, as economic obsolescence, the capitalized difference in income between income that would be expected at its estimated depreciated replacement cost and the income actually generated. The resulting figure was slightly higher than book value due to the fact that, for the years involved, Algonquin earned slightly more than its FERC-projected income. In effect, this approach equates economic obsolescence with FERC's refusal to let Algonquin include depreciated assets in the rate base, and is merely a restatement, after a series of calculations, of petitioners' argument that property not included in the rate base has no value.

20.). As the Supreme Court of Kansas observed in reviewing the testimony before the trial court in a pipeline valuation property tax case:

as time goes on, the value of original cost [as a measure of true value] ... diminishes, principally because of two factors that immediately start to work on this particular cost item: one is the effect of inflation, the other is the factor of depreciation, and this, over the years, would tend to minimize the validity of original cost in itself as a true measurement of value. [*Northern Natural Gas Co. v. Dwyer*, 208 *Kan.* 337, 351, 492 *P.*2d 147, 159 (1971), appeal dismissed, *cert.* denied, 406 *U.S.* 967, 92 *S.Ct.* 2408, 32 *L.Ed.*2d 665 (1972).]

For this reason, courts in this state have generally refused to consider depreciated original cost as probative of the property tax value of utility property. *See, e.g., Transcontinental II, supra,* 9 *N.J.Tax* at 643–44 (citing cases); *Haworth, supra,* 178 *N.J.Super.* at 261, 2 *N.J.Tax* at 313; *Public Serv. Elec. & Gas, supra,* 139 *N.J.Super.* at 20.

The handful of cases in our state in which evidence of original cost was considered probative of fair market value are readily distinguishable on the basis of the record before the courts involved. In *Hackensack Water Co., supra,* 77 *N.J.* at 217–18, for example, the Court, in rejecting a municipality's attempt to value land at the bottom of a reservoir as residential property, accepted the acquisition cost of the property as its fair market value in place of a lower nominal cost, which had been assigned by the Division of Taxation. It did so, however, in the absence of any evidence concerning replacement cost and indicated that valuing such property according to its trended original cost would be proper. Similarly, in *Texas Eastern, supra,* 116 *N.J.Super.* at 16–19, and *Transcontinental I, supra,* 115 *N.J.Super.* at 598–600, although the Appellate Division's opinions read as if they were establishing a *per se* rule defining the fair market value of a pipeline as its depreciated original cost, they expressed a willingness to reexamine this determination on a different record. The validity of these opinions are thus limited to the particular facts before the courts at the time of decision, and in light of our decision today

have no precedential authority with respect to the issue of valuation.

Taxpayers present two arguments in support of their contention that the depreciated original cost of their property should control its property tax valuation. The first is that since the use of their property is regulated, it should be valued for property tax purposes in the same manner as it is in FERC regulatory proceedings. This argument is singularly unpersuasive. As *Hope Natural Gas Co., supra,* 320 *U.S.* at 602–04, 64 *S.Ct.* at 287–89, 88 *L.Ed.* at 345, points out, the link between the actual value and regulatory value of interstate natural gas pipelines was broken forty-four years ago, and petitioners have failed to provide any persuasive reason again to forge together actual value and regulatory value. Courts in other states have long recognized "a definite distinction between the valuation of public utility property for ratemaking purposes, determined pursuant to statutes applicable thereto, and the valuation of the same property pursuant to different statutes for ad valorem tax purposes." *Northern Natural Gas Co., supra,* 208 *Kan.* at 357–58, 492 *P.*2d at 164. Even Massachusetts, which considers depreciated original cost as probative evidence of the worth of utility property, has rejected the argument that actual value mirrors regulatory value:

> The value of property for rate-making purposes, related, as it is, to assuring provision for an adequate return on a utility's investment, may have little to do with what the property would sell for on a free and open market. The original cost of property, reduced by a fixed annual rate of depreciation, hardly is a guaranteed measure of the fair market value of that property. [*Boston Edison Co., supra,* 387 *Mass.* at 303–04, 439 *N.E.*2d at 767.]

■ It should be noted that, in the context of rent control, this Court has recognized that public utility precedents are of limited usefulness in determining market value and that the meaning of the term "value" must be derived from the purpose for which the valuation is being made. *Troy Hills Village v. Parsippany Troy Hills Tp. Council,* 68 *N.J.* 604, 622–23 (1975). The "position that 'rate-making' value and 'exchange' value serve different functions and need not coincide [citations omit-

ted] has long since become the law of the land." *Id.* at 624. Therefore, in and of itself, the fact that FERC's regulatory scheme includes a value determination for its own purposes does not bind municipalities to that figure for the purposes of *ad valorem* property taxation.

The second argument advanced by taxpayers is that since the only realistic use of this property is as a natural gas pipeline serving its current customers, and FERC will not allow a potential purchaser to include in the rate base any sales price exceeding the depreciated original cost of the property, that figure should predominate in the determination of fair market value. Although some courts have found this reasoning to be persuasive, *see, e.g., Boston Edison Co., supra,* 387 *Mass.* at 306–08, 439 *N.E.*2d at 769; *State ex rel. Wisconsin River Power Co. v. Board of Review of Armenia,* 125 *Wis.*2d 94, 101–03, 370 *N.W.*2d 580, 584 (Ct.App.1985), review denied, 125 *Wis.*2d 582, 375 *N.W.*2d 214 (1985), a closer examination of the reasons for this limitation on the sales price of such property dispels its relevance to its cost valuation.

■ The problem with this approach is that it attempts to value the property from the wrong perspective. Under the cost approach as it applies to special purchase property, the costs of a third person in acquiring the property is not the relevant inquiry; the very reason the cost approach is being utilized is that the property is so uniquely suited to its current use and user that a market sale to a third person is not an accurate indication of its value. *See, e.g., CPC International, supra,* 193 *N.J.Super.* at 269. Rather, the determination made in applying the cost approach is how much would a prudent person pay to replace the property. *See The Appraisal of Real Estate, supra,* at 214–15. Since the people with the greatest interest in replacing special purchase property are the people for whom it was designed and built, and, in addition, are the people who must assume the cost of property taxation, the relevant question to ask in applying the cost approach to utility

property is how much the ratepayers would pay to replace the property.

The reason why FERC will not allow the rate base to be escalated to reflect a new purchase price is not because the property has no value above its depreciated original cost, but because this is the limit of an investor's interest in the property. Under FERC regulation, the price of gas is set to produce sufficient revenues to cover the utility's costs and provide a reasonable return on the value of the property invested in the rate base. T. Morgan, J. Harrison, & P. Verkuil, *Economic Regulation of Business,* 223 (2d ed. 1985). The interest of an investor in the utility's property is thus limited to earning a reasonable return on the undepreciated assets of the utility; the interest in any residual value of the depreciated property belongs to the ratepayers. *See United Gas Pipeline Co.,* 25 *F.P.C.* 26, 64 (1961). One of the factors included in the cost of service element of the ratemaking proceedings is depreciation, reflecting the fact that one of the costs of the gas is the value of the capital assets consumed in providing service to consumers. *South Dakota Pub. Util. Comm'n v. Federal Energy Reg. Comm'n,* 643 *F.*2d 504, 517 (8th Cir.) (Heaney, J., dissenting), rev'd on reh'g, 668 *F.*2d 333 (8th Cir.1981) (en banc). This is why FERC will not allow stepping up of a utility's rate base to reflect a purchase price above depreciated original cost; since the consumers have already paid for part of the asset, increasing the rate base to allow the property to be depreciated again would force consumers to pay for the same property twice. Thus, FERC by this process recognizes the ratepayer's interest in the residual value of fully depreciated property. *See United Gas Pipeline Co., supra,* 25 *F.P.C.* at 64 (refusing to increase rate base of utility property purchased by another utility since, under FERC regulatory scheme "the consumers of a public utility service compensate investors in the public utility for building the plants ... [and] the investors in the buying company are simply taking over the former company's claim to

a return of and on the capital originally devoted to public service").

 If FERC depreciated utility property at the same rate at which it wore out, this residual value would vanish. However, for a variety of reasons, FERC allows natural gas pipeline companies to depreciate their property over a much shorter span of time than the property's functional life. Here, for example, FERC allowed taxpayers straightline depreciation of their property at 3% a year, a figure subsequently raised to 3.5%. On this basis, the property would be fully depreciated in approximately thirty years. Based on the testimony of taxpayers' own experts, however, properly maintained natural gas pipelines have a virtually infinite lifespan; as long as there is a demand for natural gas, taxpayers' pipeline will have some functional use. In light of this, in the absence of evidence to the contrary, the Township's estimation of a 100 year functional life was not unreasonable.[6] Therefore, taxpayers' property, when fully depreciated, will still have most of its useful life ahead of it, and taxpayers conceded that along with this useful life comes a substantial residual value. *See also Northern Natural Gas Co., supra,* 208 *Kan.* at 359–60, 492 *P.*2d at 165 (discussing this phenomenon). The reason why this residual value is not included in sales of utility property is not because it does not exist; it is because this value is properly attributed to

---

[6]The Tax Court rejected this figure as excessive. It appears, however, that there was no evidence in the record that contradicts this figure. While FERC regulations recognize that eventual exhaustion of natural gas resources may cut short a pipeline's functional life and is thus a relevant factor in determining depreciation for FERC ratemaking purposes, *see* 18 *C.F.R.* Part 201–12B (1986), an increase in the rate of depreciation to reflect this factor has never been sustained, despite the deferential standard of review applied to FERC regulatory determinations. *See South Dakota Pub. Util. Comm'n, supra,* 668 *F*2d at 334–35 (finding FERC depreciation figure reflecting assumption that pipeline would run out of gas in the year 2000 to be outside of the zone of reasonableness and not supported by substantial evidence); *accord Memphis Light, Gas & Water Div. v. Federal Power Comm'n,* 504 *F.*2d 225, 234 (D.C.Cir. 1974).

the ratepayers. In essence, then, the use of original depreciated cost as a cap or ceiling on the worth of a utility's assets fails to value all of the interests in the property. *Cf. Town of Secaucus v. Damsil, Inc.,* 120 *N.J.Super.* 470, 474 (App.Div.) (proper inquiry for property tax purposes is to determine the value of all of the interests in the property), certif. denied, 62 *N.J.* 90 (1972).

This "lost" residual value is not reflected in the market and income approaches, which value only the investor's interest in the property. However, it is precisely because these valuation methods fail to reflect unique aspects of a property's value that the cost approach predominates in the valuation of special purpose property. While an investor would not pay for this residual value, since it is not includable in the rate base upon which its rate of return is estimated, the ratepayers would definitely pay to replicate this capacity if by chance the current pipeline were to be destroyed. In fact, if the pipeline were to be destroyed, FERC would allow its total cost of replacement to be included in the rate base as the replaced pipeline's book value. *See, e.g., Montana Power Co. v. Federal Energy Reg. Comm'n,* 599 *F.*2d 295, 299 (9th Cir.1979). Therefore, under the cost approach, valuing all of the interests in the property, the value representing the remaining useful life of "fully depreciated" assets should be included in the tax assessment valuation.

In a similar fashion, the cost approach recognizes other elements of value of the property to the ratepayers that would be overlooked by the market and income approaches. Both of these valuation methodologies, when applied to property such as taxpayers' reflect the effects of FERC's valuation method for regulatory purposes. The purposes of FERC regulation and *ad valorem* property taxation are drastically different: FERC is primarily concerned with ensuring that investors receive an adequate return on the property that has been invested. For such purposes, the original value of the property

invested is an appropriate measure of value. *See Hope Natural Gas Co., supra,* 320 *U.S.* at 605, 64 *S. Ct.* at 289, 88 *L.Ed.* at 346. For property tax purposes, however, it is necessary to determine the present cost of replacing the property. Under the cost approach, this is assumed to be the value of the property to the ratepayers, reflecting increases in construction costs, the current demand of consumers, availability and cost of alternate energy sources, and other factors. FERC's regulatory system reflects these factors only as of the time an asset enters the rate base; it makes no attempt to update them until an asset's functional lifespan is reached and it is eventually replaced at current costs. *See United Gas Pipe Line Co., supra,* 25 *F.P.C.* at 63–64. Since depreciated original cost fails to reflect the value of all of the interests in utility property and undervalues those it does recognize, we decline to accept it as a true measure of a utility property's worth, and affirm the Tax Court's treatment of petitioners' cost approach valuations.

### III.

Before turning to the validity of the original assessment, we must address some of the taxpayers' objections to valuing their property for taxation purposes at its depreciated replacement cost.

 Taxpayers' first charge that refusing to include a reduction to reflect the fact that their income is subject to regulation amounts to discriminatory treatment since under rent control, a somewhat similar regulatory cap on value is recognized with respect to property tax assessments. Initially, although there are some similarities, rent control is factually distinguishable in that it presupposes a finite number of apartments to be rented, whereas FERC makes no attempt to limit the amount of gas taxpayers can sell at a given rate. In addition, to the extent that taxpayers testified that they probably could not raise their rates without losing business even if FERC regulation was lifted, it does not appear that FERC

regulation is imposing an artificial cap on income given the current structure of the pipelines. More importantly, however, rent control is recognized in the property assessment process only to the extent that adjustments are made to comparative sales and income data derived from uncontrolled apartments in an attempt to determine fair market value or an appropriate economic rent for apartments subject to rent control. Since the valuation upheld by the Tax Court below involved neither the market nor income approach or comparisons to unregulated pipelines, it is not clear how or why such an adjustment should be performed as part of a replacement cost valuation.

■ Second, taxpayers claim that valuing their property differently for tax and ratemaking purposes will reduce the profitability of their companies and hurt their investors. Under FERC regulatory practice property taxes are considered a cost of service and passed through to the consumers. *See Hope Natural Gas Co., supra,* 320 *U.S.* at 614 n. 24, 64 *S.Ct.* at 293 n. 24, 88 *L.Ed.* at 351 n. 24. Taxpayers presented no evidence that FERC has ever denied local taxes as a reasonable cost. Therefore, there is no support for taxpayers' contention that increases in property taxes will have to be paid out of net earnings, let alone their fear, echoed by the dissent in the Appellate Division, that property taxes, if left unchecked, could eventually absorb all of the company's net earnings.

■ Finally, in a related argument, taxpayers contend that the increase in cost caused by increases in property taxes could raise the price of gas to the point where some consumers would switch to alternate sources of energy. To this contention, three things need to be said. First, intentionally undervaluing utility property in order to enable the utility to retain its volume of sales would amount to a subsidy to gas consumers by other local taxpayers. This would be inequitable. As the Appellate Division noted with respect to a similar regulatory scheme administered by the Public Utilities Commission:

A utility's tax liability, by whatever method derived, will ultimately receive consideration by the P.U.C. in its rate determinations, thus passing on to the utility's consumers the local tax liability imposed. Using a specially derived principle of valuation for local tax purposes would place the impact thereof on the local residents rather than the consumers.... [*Public Serv. Elec. & Gas Co., supra*, 139 *N.J.Super.* at 20.]

Second, such intentional undervaluation would conflict with the goal of FERC regulation: to have the cost of gas reasonably reflect the cost of providing such service. Third, to the extent that an increase in property taxation resulted in a significant reduction in the volume of gas sold by taxpayers, this reduction would be properly recognizable as economic obsolescence. Economic obsolescence is the adverse effect on value resulting from influences outside the property itself, including factors such as an adverse economic climate. *The Appraisal of Real Estate, supra*, at 252. Applying this principle in the context of the cost approach, the value of the pipeline should reflect the cost of replacing only the size pipeline necessary to carry the reduced volume. *See, e.g., Boston Edison Co. v. Board of Assessors of Boston*, 402 *Mass.* 1, 520 *N.E.* 2d 483, 491 (1988); *New England Power Co. v. Town of Littleton*, 114 *N.H.* 594, 600–01, 326 *A.*2d 698, 702 (1974) (replacement cost should reflect asset needed to meet current demand).

In sum, we see nothing unjust or inequitable in valuing the property of a regulated utility at its depreciated replacement cost.

## IV.

Since taxpayers presented no credible evidence concerning the true value of their property, the Tax Court was correct in concluding that the presumption of validity that attaches to the *quantum* of the municipality's original assessment had not been rebutted. *See Transcontinental II, supra*, 9 *N.J.Tax* at 645–46. *See also, Aetna Life Ins. Co., supra*, 10 *N.J.* at 105. Normally, this determination would end our inquiry. However, taxpayers allege that the method of assessment utilized by the municipality was so patently defective and

aberrant as to justify removal of the presumption of validity. *See Pantasote, supra,* 100 *N.J.* at 415. We agree with taxpayers that the methodology utilized in the original assessment manifested an arbitrary or capricious discharge of the assessor's responsibilities. We determine that, when confronted by such a totally deficient valuation methodology, which provides no reliable indication that the *quantum* of the assessment is itself reasonable, the Tax Court is obligated to exercise its power to make an independent assessment based on the evidence before it and data properly at its disposal. *See F.M.C. Stores Co. v. Borough of Morris Plains,* 100 *N.J.* 418, 430–31 (1985).

The flaws in the original assessment methodology were exposed during the deposition of the assessor who prepared it. Confronted with the difficulty of applying other valuation approaches to taxpayers' property, the assessor simply calculated the value of the property necessary to produce approximately the same tax dollars at the Township's new tax rate as it had the previous year under its old tax rate.[7] The assessor thus made no attempt to determine the rate at which taxpayers' property appreciated in relation to the increase in value of other kinds of property in the Township. Without evidence that all kinds of property in the Township, whether it be residential,

---

[7]The assessor described the process:

Q And in fact, you simply multiplied the 1981 assessment by the value of three, didn't you?
A Essentially.
Q Yes. There was no other process in arriving at the value for the 1983 tax bill, was there?
A That was what is available to me, yes.

\* \* \* \* \* \* \* \*

Q But the 1982, October 1, 1982 evaluation for 1983 taxes was arrived at simply by your trending factor of three?
A Well ... I would [sic] subscribe to the adjective simply. The average of three was the result of ... 4,400 other appraisals that were made in town.... So as the three is a simple number, it was certainly not arrived at simply.

commercial or industrial, appreciated at the same rate, and that pipeline property was comparable to these other types of property, such an assumption was improper.

Furthermore, the assessor perpetuated this erroneous approach in his attempt to couch his valuation estimate in terms of replacement cost. Rather then determining the replacement cost new and then adjusting this value to reflect the remaining useful life of taxpayers' property the assessor took the value of the property determined to produce the same tax dollars as the previous year and then, assuming a 45% depreciation factor, determined what replacement cost new would lead to the predetermined assessed value.[8] Finally, although the actual depreciation rate was irrelevant to the assessor's valuation method, it should be noted that the figure used was not derived from any actual estimate of the property's remaining functional life but the upper level of depreciation set by the *Transcontinental I* court as part of its interim valuation method, the same method which was rejected by the assessor in deriving the property's assessment for the 1983 tax year.

The assessor's methodology was thus a perversion of proper appraisal techniques at every step of the process. Although in *Glen Wall Assoc. v. Wall Tp.*, 99 *N.J.* 265, 276–77 (1985), we indicated that the Tax Court should recognize practical and realistic limits in establishing the foundation necessary to support an expert's valuation, this does not compromise the expert's duty to fully document his determination. *Id.* at 280. While the assessor did compare his artificial cost figures with average estimated cost figures available in commercial hand-

---

[8]This was the assessor's explanation:

Q ... You say you took an aggregate value of $1,698,800, is that correct?
A That's the total assessed value.
Q Yes. You then took 45 percent depreciation from that?
A No. I am saying that the $1,698,800 is—does represent a depreciated value for assessment purposes. And utilizing a 45 percent depreciation factor, you then arithmetically are asking yourself $1,698,800 is 55 percent of what number.

books, as well as recent actual construction figures for a comparable natural gas pipeline in a neighboring community, and aspects of the Township's expert's testimony tended to support the original assessment, these factors do not in any sense validate the assessment approach followed by the tax assessor in this case or lend reliability to the *quantum* of his assessment. They would, however, be relevant to the Tax Court's exercise of its power, in circumstances where the presumption of validity does not apply, to use the information available to it to make an independent determination of value. *See, e.g., F.M.C. Stores Co., supra,* 100 *N.J.* at 430–31; *Pantasote, supra,* 100 *N.J.* at 416; *Glen Wall, supra,* 99 *N.J.* at 280. It may well be that on remand the Tax Court will reach a valuation not dissimilar to that reached in the original assessment.

## V.

In light of the large number of similar natural gas pipeline property tax valuation cases currently awaiting decision in the Tax Court, we deem it prudent to make a few advisory observations on how such cases should be decided in the absence of legislative action, which has been called for in the past but has not yet been forthcoming. *See, e.g., Transcontinental I, supra,* 58 *N.J.* at 586; *Transcontinental II,* 9 *N.J.Tax* at 646; *Texas Eastern, supra,* 116 *N.J.Super.* at 19, 20. While each case will turn on its own facts, there are certain elements that these cases will have in common.

First, the proper method of valuing such property is by determining its depreciated replacement cost. A natural gas pipeline is a textbook example of special purchase property; it is uniquely suited to its current use and, due to the effects of FERC regulatory conditions, both the market and income approaches are inherently unreliable indicators of the fair market value of such property, as opposed to its worth to investors as an operating business. In *Haworth, supra,* 178 *N.J.Tax* at 261,

2 *N.J.Tax* at 313, and *Public Serv. Elec. and Gas Co., supra,* 139 *N.J.Super.* at 20–21, the Appellate Division reached this same conclusion with respect to property subject to a regulatory process substantially similar to that applied to petitioners by FERC, and we see nothing in the nature of natural gas pipelines that would warrant a different treatment.

Second, in using the depreciated replacement cost approach, particular care must be taken to make a proper reduction to account for economic obsolescence. Economic obsolescence reflects a reduction in the value of property caused by factors extraneous to the property itself, such as changes in population characteristics and economic trends, excessive taxes, and governmental restrictions. Although the Township's expert testified to the lack of any economic obsolescence, and the Tax Court properly rejected Algonquin's attempt to convert economic obsolescence into a surrogate for the unit valuation income approach, determining the existence and extent of economic obsolescence is an integral part of any proper application of the cost approach. In *Brooklyn Union Gas Co., supra,* 65 *N.Y.*2d 485–87, 492 *N.Y.S.*2d at 602–04, 482 *N.E.*2d at 81–82, the validity of the cost approach was predicated on the assumption that the pipeline, if destroyed, could reasonably be expected to be replaced. Economic obsolescence becomes the vehicle through which it is determined in what form the pipeline would be replaced.

Here, there was testimony that external economic developments, such as increases in the price of gas and the capability of some consumers to switch from gas to other sources of energy, had the potential to affect the demand for gas. To the extent that over the years such factors have led to what was once a well-designed pipeline now having excess capacity, depreciated replacement cost should be geared only to the pipeline that would be constructed in light of current and projected future demand. Similarly, to the extent that any increases in taxes caused a similar reduction in volume of gas demanded,

this factor would be reflected in a similar manner. This consideration in some measure addresses the concern expressed in the dissent below that the impact of adopting the depreciated replacement cost approach on the pipeline as a whole should be considered in the assessment process. *Transcontinental II*, 9 *N.J.Tax* at 648. It simply does not follow, however, that the process by which FERC establishes a reasonable price for the gas sold by petitioners should be equated with economic obsolescence limiting the fair market value of the property to the value of the property used in FERC ratemaking proceedings.

 Finally, care must be taken to determine an equitable manner of calculating replacement costs. *Cf. Haworth, supra*, 178 *N.J.Super.* at 261, 2 *N.J.Tax* at 313 (describing the elements of trended original cost methodology). The approach used by the Township's expert in this case was to determine the current cost of constructing a length of pipe, multiplying this figure by the length of pipeline to be valued, determining the expected lifetime of such a pipeline and then reducing the replacement cost to reflect the loss in value caused by the pipe in question already having served part of its functional life. This is an acceptable method of determining replacement cost, as long as economic obsolescence is properly reflected, but there are others. In particular, the trended original cost approach, suggested in *Hackensack Water Co., supra*, 77 *N.J.* at 217–18, and outlined in *Haworth*, in which the original cost is subject to yearly adjustments to reflect depreciation and increased costs of replacement, may in some cases be a more convenient valuation methodology. *See Northern Natural Gas Co., supra*, 208 *Kan.* at 349–51, 492 *P.*2d at 158–59 (describing the trended cost approach).

Whatever method of determining replacement cost is utilized, the goal should be to arrive at a value which properly reflects the value of the pipeline that would be required to meet the current demand of consumers of natural gas, since they are in fact the people who would both demand the replacement of the

pipeline if it were destroyed and who in fact pay the taxes on the property. As such, the worth they would attribute to the pipeline is the best barometer of its fair market value.

The decision below is reversed and remanded to the Tax Court for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, POLLOCK, HANDLER, O'HERN, GARIBALDI, and STEIN—7.

*Opposed*—None.